*This opinion is subject to revision before final publication in the Pacific Reporter.*

**2013 UT 46**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

In the Matter of the ESTATE OF WILLIAM J. HANNIFIN

MAX HILL, as Special Administrator of the Estate,
*Appellant,*
*v.*

WILLIS NAKAI, individually and as
Personal Representative of the Estate,
*Appellee.*

No. 20111125
Filed August 2, 2013

Third District, Salt Lake
The Honorable Robert K. Hilder
No. 103900808

Attorneys:

Charles M. Bennett, Salt Lake City, for appellant

Donald J. Winder, Jerald V. Hale, Salt Lake City, for appellee

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT and ASSOCIATE CHIEF JUSTICE NEHRING
joined.

JUSTICE DURHAM filed a dissenting opinion,
in which JUSTICE PARRISH joined.

JUSTICE LEE, opinion of the Court:

¶1    Max Hill, in his capacity as Special Representative of the Estate of William J. Hannifin, appeals from a district court order awarding Willis Nakai a portion of that estate. Though Nakai is neither biologically nor legally related to Hannifin, the district court determined that he was nonetheless entitled to inherit under the doctrine of equitable adoption.

¶2 We reverse. We hold that the doctrine of equitable adoption, first recognized in *In re Williams' Estates*, 348 P.2d 683 (Utah 1960), has been preempted by the detailed provisions of Utah's Probate Code. *See* UTAH CODE §§ 75-1-101 to -8-101. And, because Nakai does not qualify under the Probate Code's intestate succession provisions, we reverse the decision entitling him to inherit from Hannifin.

I

¶3 Willis Nakai is a member of the Navajo Nation. He was raised by his aunt from infancy to age five or six. After her death, he attended a series of boarding schools, though his biological parents were living and married to each other throughout his childhood. At one of these schools, the Intermountain Indian School (IIS) in Brigham City, Utah, Nakai met Father William J. Hannifin, an Episcopal priest.

¶4 In the summer of 1958, Hannifin had occasion to visit the Navajo Reservation near Aneth, Utah, where Nakai and his family were then residing. During this visit, Hannifin had a conversation with Nakai's mother and maternal grandparents, during which Nakai's mother asked Hannifin to take Nakai—who was fourteen years old at the time—and raise him as his own child. Hannifin agreed. Because Nakai's father was frequently away from home and not involved in family matters, he was not a party to this conversation.

¶5 Hannifin assumed this parental role when Nakai returned to IIS the following school year. Though Nakai subsequently made brief yearly visits to see his biological family, his parents did not assert parental control over him and did not support him financially. Instead, from that point forward, Hannifin provided Nakai an allowance, food, clothing, medical care, transportation, and emotional support. He monitored Nakai's schoolwork and generally provided for Nakai's health and welfare. Though Nakai initially boarded at IIS and visited Hannifin only on weekends and holidays, he began living with Hannifin full time after he developed health problems during his secondary education and continued to live there throughout his secondary and college education.

¶6 From Nakai's return to IIS in 1958–59 until the end of Hannifin's life, the two referred to each other as father and son and

held themselves out to the community as such. Even after Nakai married and moved out of Hannifin's house, he and Hannifin maintained a close relationship, with Hannifin providing Nakai counsel and acting as if he were grandfather and great-grandfather to Nakai's children and grandchildren. Hannifin even arranged for many of his assets, including his life insurance policy, bank accounts, and investment accounts to be transferred to Nakai upon Hannifin's death.

¶7 Yet when Hannifin died in 2009, he was intestate and had no spouse and no biological descendants. Nakai, alleging that he and his family were Hannifin's only known heirs and devisees, petitioned to be appointed as Personal Representative of Hannifin's estate, which petition the district court granted.

¶8 Max Hill, acting on behalf of himself and nineteen other collateral relatives of Hannifin, petitioned the court to be appointed Special Administrator of Hannifin's estate for the limited purpose of contesting Nakai's claim to the estate. The court granted Hill's petition and, following a bench trial, held that under the doctrine of equitable adoption, Nakai was entitled "to inherit from Father Hannifin's estate as though he were his legally adopted son." The district court also awarded Nakai attorney fees, which Hill opposed on the grounds that Nakai was not eligible to serve as Personal Representative.

¶9 Hill filed this appeal, arguing that Utah's enactment of the Probate Code preempted the common law doctrine of equitable adoption. That is a question of law, which we review de novo. *See Navajo Nation v. State* (*In re Adoption of A.B.*), 2010 UT 55, ¶ 21, 245 P.3d 711.

## II

¶10 We have long recognized the axiom "that our precedent must yield when it conflicts with a validly enacted statute." *Patterson v. Patterson*, 2011 UT 68, ¶ 37, 266 P.3d 828. Statutes "may preempt the common law either by governing an area in so pervasive a manner that it displaces the common law" (field preemption) "or by directly conflicting with the common law" (conflict preemption). *OLP, L.L.C. v. Burningham*, 2009 UT 75, ¶ 16, 225 P.3d

3

177.[1] Preemption may be indicated expressly, by a stated intent to preempt the common law. "More often," however, "explicit preemption language does not appear, or does not directly answer the question. In that event, courts must consider whether the . . . statute's structure and purpose or nonspecific statutory language nonetheless reveal a clear, but implicit, pre-emptive intent." *Bishop v. GenTec Inc.*, 2002 UT 36, ¶ 9, 48 P.3d 218 (alteration in original) (internal quotation marks omitted).

¶11 We have relied on "the federal model for determining whether federal law pre-empts state law" to determine "whether a state statute pre-empts the common law." *Id.*; s*ee* UTAH CODE § 68-3-2(1) ("The rule of the common law that a statute in derogation of the common law is to be strictly construed does not apply to the Utah Code."). Under that model, "[f]ield preemption occurs when the scope of a statute indicates that [the legislature] intended [a statute] to occupy a field" in such a way "as to make reasonable the inference that [the legislature] left no room for the [common law] to supplement it." *In re Adoption of A.B.*, 2010 UT 55, ¶ 31 (internal quotation marks omitted). Conflict preemption, on the other hand, "occurs where it is impossible . . . to comply with both [the common law] and [a statute], or where [the common law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of [the legislature]." *Id.* ¶ 33 (alteration in original) (internal quotation marks omitted).

¶12 This notion of conflict preemption is reiterated in the Probate Code. Though the Code provides that "principles of . . . equity supplement its provisions," UTAH CODE § 75-1-103, it also contains an express caveat that principles of equity may not be invoked where they are "displaced by the particular provisions of th[e] code." *Id.* A judge-made doctrine that conflicts with a statute is certainly "displaced" by it.[2]

---

[1] *See Daniels v. Gamma W. Brachytherapy, LLC*, 2009 UT 66, ¶ 49, 221 P.3d 256 ("A statute preempts a common law claim by specifically adopting a limitation or prohibition on a claim or by comprehensively addressing a particular area of law such that it displaces the common law.").

[2] The argument that equitable adoption properly "supplement[s]" the Code because it operates "parallel with" it *infra* ¶¶

¶13 We find the Code to displace the doctrine of equitable adoption recognized in *Williams' Estates*. In that case, a couple took a child into their home, agreeing with the birth mother that they would adopt the child and "raise, care for and treat [her] in all respects as their own child." *In re Williams' Estates*, 348 P.2d 683, 685 (Utah 1960). Though they never formally adopted the child, they did raise her as their own. *Id.* at 684. And when the couple died intestate, the child claimed that "she should be awarded the same share of the Williamses['] estate as she would have been entitled to had they . . . fulfilled their agreement to adopt." *Id.* We agreed that a child in that situation could possibly inherit through intestacy, noting that

---

39–40, is an effective acknowledgement that the two cannot be reconciled. A doctrine that operates outside (parallel to) the Code cannot be seen as a supplement to it. That is not to say that no provision of the Probate Code is amenable to supplementation. It is merely a recognition that the provisions prescribing who can take through succession (and in what order) are not. They are clear and detailed and leave no room for common-law adaptation. *See Riddell v. Edwards*, 76 P.3d 847, 855–56 (Alaska 2003) (recognizing that Alaska's Uniform Probate Code gives courts "latitude to supplement statutory provisions with equitable principles" but deciding that "the particular provisions of statutory law governing void and voidable marriages and accrual of allowances and share fully covered [the circumstances of the case] and affirmatively displaced the equitable remedy" sought (internal quotation marks omitted)). So the fact that we may have supplemented other parts of the Code in the past has no bearing on our decision in this case. *See infra* ¶ 40 (citing cases where we have purportedly "supplemented [the code] in . . . outcome-determinative ways"). In any event, in none of these past instances have we supplemented the Code in a way that conflicts with it. *See, e.g., In re Estate of Pepper*, 711 P.2d 261, 263 (Utah 1985) (holding that a rule 60(b) motion can vacate an otherwise final closing order, a result that is specifically allowed under section 75-1-304's assertion that "the rules of civil procedure, including the rules concerning vacation of orders and appellate review, govern formal proceedings under the [Probate Code]" (internal quotation marks omitted)).

> [i]t is generally recognized that where a child's parents agree with the adoptive parents to relinquish all their rights to the child in consideration of the adopted parents' agreement to adopt such child, . . . and such agreement is fully performed by all parties connected with such contract except there is no actual adoption, the courts will decree specific performance of such contract and thereby award to the child the same distributive share of the adoptive parents' estate as it would have been entitled to had the child actually been adopted as agreed.

*Id.*

¶14 In such circumstances, we determined that "[a] contract to adopt . . . may be proved by circumstantial evidence, but such evidence must be clear and convincing." *Id.* at 684–85. Though we have not had occasion to opine on this doctrine since it was recognized, most other jurisdictions employing the doctrine have followed the same path, requiring claimants to prove the existence of an agreement to adopt. *Modern Status of Law as to Equitable Adoption or Adoption by Estoppel*, 122 A.L.R. 5th 205 (2012). Most also limit use of the doctrine to situations that benefit the equitably adopted child, meaning, for example, that the doctrine does not prevent the equitably adopted child from inheriting from natural parents, and typically cannot be used by an adoptive parent to inherit from the equitably adopted child. *Id.* Courts deem these and other similar restrictions proper "since equitable adoption is only an equitable remedy to enforce a contract right, is not intended or applied to create the legal relationship of parent and child, with all the legal consequences of such relationship, [and] is [not] meant to create a legal adoption." *Id.*

¶15 The Probate Code, enacted fifteen years after we embraced equitable adoption in *Williams' Estates*, is in direct conflict with the doctrine in three principal respects: (A) Equitable adoption allows children who cannot satisfy the Probate Code's definition of "Child" to nonetheless participate in intestate succession as if they had. (B) Equitably adopted children can take by succession from both natural and adoptive parents—despite the Code's clear mandate to the contrary. (C) The doctrine adds confusion and complexity to our law's intestate succession scheme, in contraven-

tion of the Code's stated purpose of streamlining and clarifying the distribution of a decedent's estate.

¶16 In light of these conflicts, the equitable adoption doctrine cannot be squared with the Probate Code; it is impossible to satisfy both the requirements of the Probate Code and the elements of equitable adoption.[3] This is a doctrine in conflict with the Code, which we therefore repudiate as preempted by statute.[4]

A

¶17 At the time of our decision in *Williams' Estates*, our intestate succession statutes did not define the terms "child" or "parent." *See* UTAH CODE § 74-4-1 to -24 (1953). They did not distinguish classes of children that could take by succession (such as natural and adopted children) from those that could not (like foster children, stepchildren, and grandchildren). The Probate Code changed the landscape by providing precise definitions of parties legally entitled to take by intestate succession. These provisions displaced the open-ended system within which *Williams' Estates* was situated.[5]

---

[3] Though we typically "reconcile the common law with statutory law whenever possible," *see infra* ¶ 36, here, for all the reasons discussed below, reconciliation is not possible.

[4] Though a number of states that have adopted the Uniform Probate Code have continued to endorse equitable adoption, *see e.g.*, *Poncho v. Bowdoin*, 126 P.3d 1221, 1226 (N.M. Ct. App. 2005); *Johnson v. Johnson*, 617 N.W.2d 97, 101 (N.D. 2000), none of these states, to our knowledge, have considered the key question addressed herein—whether there are conflicts between the Code and the common law doctrine that sustain a finding of preemption. *See, e.g.*, *Calista Corp. v. Mann*, 564 P.2d 53, 61 & n.18 (Alaska 1977) (accepting and applying the doctrine without any preemption discussion or analysis). And absent some analysis of this pivotal issue, these precedents are unhelpful. We look to other states' caselaw to help us analyze the legal questions before us, not as a statistical exercise of nose-counting.

[5] Admittedly, the previous version of the Probate Code detailed the order in which different categories of takers took through suc-

¶18 The Probate Code provides that "[a]ny part of a decedent's estate not effectively disposed of by will passes by intestate succession to the decedent's heirs as provided in" the Code. UTAH CODE § 75-2-101(1). Thus, the Code establishes a detailed scheme that governs the priority by which certain classes of heirs are entitled to succeed to the decedent's estate. Under the Code, "[a]ny part of the intestate estate" that does not pass to the decedent's spouse (because, for example, the decedent's spouse did not survive him) passes "to the decedent's descendants per capita at each generation," *id.* § 75-2-103(1)(a), and if no surviving descendants exist, then to the decedent's parent(s), *id.* § 75-2-103(1)(b). And if neither parent survived the decedent, the estate goes to the parents' descendants, if any, and then, if none exist, to the decedent's grandparents or the grandparents' descendants. *Id.* § 75-2-103(1)(c)-(e).

¶19 The second group of takers, "the decedent's descendants," generally includes a decedent's children, "with the relationship of parent and child . . . being determined by the definition of child and parent contained in [the Probate Code]." *Id.* § 75-1-201(9). And according to the Code, a "Child" is "any individual entitled to take as a child under this code by intestate succession from the parent whose relationship is involved and excludes any person who is only a stepchild, a foster child, a grandchild, or any more remote descendant." *Id.* § 75-1-201(5). "Parent" similarly "includes any person entitled to take, or who would be entitled to take if the child died without a will, as a parent under this code by intestate succession from the child whose relationship is in question and excludes any person who is only a stepparent, foster parent, or grandparent." *Id.* § 75-1-201(33). And "for purposes of intestate succession by, through, or from a person, an individual is the child of the individual's natural parents" and "[a]n adopted individual is the child of the adopting parent or parents and not of the natural parents." *Id.* § 75-2-114(1), (2).

¶20 By enacting a Probate Code with a specific definition of "child" that excludes those "equitably" adopted, the legislature

---

cession. *See* UTAH CODE § 74-4-5 (1953). But it did not define the proper members of each of these categories, and it was open-ended in that respect. *See infra* ¶ 38 n.2.

preempted common law doctrines that are in conflict with the results those definitions require.[6] *See Christensen v. Christensen* (*In re Estate of Christensen*), 655 P.2d 646, 649 (Utah 1982) (deciding that because the Probate Code "makes no mention" of a term that "figured prominently in prior statutes and case law" that the "omission must have been deliberate," particularly "[i]n a statute so carefully drafted" and determining that "re-engraft[ment]" of that term "by judicial decision" would be "inappropriate"). Under this scheme and according to these definitions, the only methods of determining who is a child for intestate succession purposes are legal adoption and natural parentage.[7] And Nakai is neither Hannifin's legally adopted nor his natural child.[8] The closest Nakai comes to any of the relations delineated in the Probate Code is to a

---

[6] *See In re Estate of Peterson*, 716 P.2d 801, 803 (Utah 1986) (refusing to allow a judgment creditor to be joined in probate court proceeding as an interested party because "the Uniform Probate Code expressly limit[s] the categories of interested persons that may present claims" and the creditor was "not among those designated").

[7] Perhaps the doctrine of equitable adoption "is not premised on our ability to judicially define the statutory term 'child' or 'parent.'" *See infra* ¶ 39. But that does not at all answer the question before us. The fact that equitable adoption countermands the statutory definitions of "child" and "parent" does. Because the statute now provides these definitions, we can no longer define those categories as we see fit. The statutory definitions foreclose our ability to decide that "justice require[s] awarding" a person that does not meet those definitions "the same inheritance she would have received if" she did. *See infra* ¶ 39.

[8] It is telling that under these definitions as well as under equitable adoption, Hannifin can never qualify as a "parent." Because, as Nakai argues, equitable adoption "is not intended to create the legal relationship of parent and child . . . and does not effect a legal adoption", it can never be used in reverse to allow an "adoptive" parent to take through intestate succession from an equitably adopted child. So, under the facts before us and as another example of the conflict between the Code and equitable adoption, not only is Nakai not a child, but Hannifin is also not a parent for purposes of intestate succession.

foster child, which is a category specifically excluded from taking intestate. Yet he falls short even there. A foster child/parent relationship is one marked by legal rights and responsibilities, neither of which existed in this case. Nakai thus can have no claim under the Probate Code to a distribution through intestate succession.

¶21 It is thus impossible to comply with both the Probate Code and with the principles of equitable adoption. *See In re Adoption of A.B.*, 2010 UT 55, ¶ 33 (stating that conflict preemption "occurs where it is impossible . . . to comply with both [the common law] and [a statute]"). Because Hannifin had neither a spouse nor children, the Probate Code requires that his estate pass to his parents or, if neither survived him, to his parents' descendants. UTAH CODE § 75-2-103(1)(a)-(c). If no takers exist in those categories, then his estate must past to his grandparents or, if none survived him, to their descendants. The statutory scheme makes this chain of distribution both clear and mandatory. And Hill and his fellow relatives qualify as takers in that chain. In contrast, equitable adoption requires that the estate pass to Nakai, a legal stranger to Hannifin, leaving nothing for Hill and the others. There is no way to reconcile the two different sets of requirements.

B

¶22 Another intractable conflict between the Probate Code and equitable adoption stems from section 75-2-114(1)-(2), which states that "for purposes of intestate succession . . . [a]n adopted individual is the child of the adopting parent . . . and not of the natural parents." This section operates to prohibit adopted children from taking by intestacy from both their natural parents and their adoptive parents. This is in direct contravention of the doctrine of equitable adoption, which is purely beneficial to the child and in no way alters the legal relationship between the claimant and the decedent or between the claimant and the biological parents. *See infra* ¶ 43.

¶23 At the time of *Williams' Estates*, dual succession was permitted under our common law. In *Benner v. Garrick* (*In re Benner's Estate*), 166 P.2d 257, 258 (Utah 1946), we recognized that principle while rejecting the argument that our succession statute foreclosed it. In so doing, the court concluded that "a great array of authority convinces us that the laws of adoption do not so limit

[the succession statute] as to cause a child, on being adopted, to lose its right to inherit from its natural parent." *Id.* The referenced succession statute provided only that "[i]f the decedent leaves no surviving husband or wife, but leaves issue, the whole estate goes to such issue, and if such issue consists of more than one child living, or one child living and the issue of one or more deceased children, then the estate goes in equal shares to the children living, or to the child living and the issue of the deceased child or children by right or representation." UTAH CODE § 101-4-5(2) (1946). The rule allowing dual inheritance existed only in the common law; it was never codified.

¶24 Thus, at the time of *Williams' Estates*, the Utah Code posed no barrier to a "beneficial" law of equitable adoption that could establish a right of succession from an equitably adopting parent without foreclosing any succession rights on the part of or flowing from natural parents. But when our legislature enacted the Probate Code fifteen years later, it expressly foreclosed that possibility. It did so by enacting section 114, which prevents a child from inheriting from two sets of parents. *See* UTAH CODE § 75-2-114(1)-(2) ("[F]or purposes of intestate succession . . . [a]n adopted individual is the child of the adopting parent . . . and not of the natural parents."). That is a significant legislative development in our law in the Probate Code and one that is in direct conflict with equitable adoption.

¶25 True, section 114 is more explicit in its rejection of the ruling in *In re Brenner's Estate* than in its overriding of the broad principle of *Williams' Estates*. But the fact that the legislature could have preempted *Williams' Estates* more explicitly is of no consequence. In any matter of statutory construction of any consequence, it will almost always be true that the legislature could have more clearly repudiated one party's preferred construction. But the converse is almost always true as well, as it is here: Just as the legislature could have explicitly discarded the doctrine by name, it also could have expressly preserved it, as the California legislature did. *See* CAL. PROBATE CODE § 6455 ("Nothing in this chapter affects or limits application of the judicial doctrine of equitable adoption for the benefit of the child or the child's issue.").

¶26 The legislature's failure to speak more clearly does not provide a basis for us interpreting the unambiguous words that it

did use. *See Badaracco v. C.I.R.*, 464 U.S. 386, 398 (1984) ("Courts are not authorized to rewrite a statute because they deem its effects susceptible of improvement."). And those words are plenty clear enough. The Probate Code expressly forecloses a core element of the doctrine of equitable adoption (dual succession).[9] That is more than enough to sustain the conclusion that the Code is in conflict with the common law doctrine, and thus that the latter is preempted.

¶27 We do not and cannot require the legislature to use magic words or express references to our precedent to preempt it. So it is no matter that "[n]o provision in the Probate Code mentions . . . equitable adoption" or that "the legislature has not specifically abolished equitable adoption," as Nakai claims. We look at the words the statute does use, the results those words require, and the scheme that they create to decide whether our precedent has a continuing place in the law. *See Bishop*, 2002 UT 36, ¶ 9; *Burningham*, 2009 UT 75, ¶ 16. And here the answer is clear. Dual succession is an inherent element of equitable adoption. Yet dual succession is expressly foreclosed by statute. The conflict is palpable and explicit. Again, it is impossible to comply with both the Probate Code and with the judge-made doctrine of equitable adoption, as the former prohibits what the latter requires. And in light of this conflict, our only option is to abandon the doctrine of equitable adoption.

---

[9] Our holding is not that section 114 contains "a one-person-one-inheritance rule." *See infra* ¶ 44. Rather, the statute establishes a one-set-of-parents inheritance rule. And equitable adoption treats an equitable adoptee as one entitled to inherit from a decedent as though she were the biological or adopted child of the decedent without cutting off inheritance rights from actual biological or adoptive parents. *See infra* ¶ 43. That treatment, moreover, runs afoul of Section 114. Our construction of that section, and of the other intestacy provisions of the Probate Code, does nothing to alter the ability of "individuals to inherit from a wide range of relatives." *See infra* ¶ 44. It simply gives proper respect to the word "relative."

C

¶28 Such abandonment is the only way to maintain fidelity to the objectives expressly detailed in the Probate Code. *See Bishop*, 2002 UT 36, ¶ 9 (stating the court considers a statute's stated objective in determining preemptive intent). As the Code indicates, its detailed intestate succession scheme is designed:

> (a) To simplify and clarify the law concerning the affairs of decedents, missing persons . . .;
>
> (b) To discover and make effective the intent of a decedent in distribution of his property;
>
> (c) To promote a speedy and efficient system for administering the estate of the decedent and making distribution to his successors;
>
> (d) To facilitate use and enforcement of certain trusts; and
>
> (e) To make uniform the law among the various jurisdictions.

*Id.* § 75-1-102(2).

¶29 The doctrine of equitable adoption undermines these objectives by introducing uncertainty, complexity, and inefficiency— the very evils the Probate Code was designed to avoid.

¶30 Though the equitable adoption doctrine has been on the books for more than fifty years, neither we nor any other Utah court has given it any dimension. This boundary-less quality is another point of incompatibility with the Probate Code, which values predictability and stability. Were we to retain the doctrine, we would have to provide predictable definition to the otherwise vague standard announced in *Williams' Estates*. For instance, in future cases we would surely be called on to decide questions along the following lines: Must both biological parents be party to the agreement to adopt? What kind of evidence is required to prove the existence of an agreement to adopt? How long must the adoptive parents treat the child as their own before the child qualifies for intestate succession? Just how limited must the child's re-

lationship with his biological family be? How completely must the natural parents relinquish "all their rights to the child"?[10]

¶31 In working to populate these fields, we would only compound the problem we identify today. With each new contour added to the standard, we would inevitably substitute our own policy choice for that expressed by the legislature when it enacted the Probate Code. We cannot condone such substitution.[11] In the Code the legislature decided, as a policy matter, that efficiency and predictability are best served by distributing the estates of those that die intestate in accordance with a prediction as to the preference of the average intestate decedent.[12] And that prediction follows biological and legal relationship lines.[13] We have no au-

_____

[10] The dissent suggests that equitable adoption doesn't conflict with the Probate Code because the statute's "invit[ation]" to supplement the Probate Code with legal and equitable principles is evidence that "the legislature evidently is willing to tolerate a degree of complication in furtherance of a just and equitable outcome." *See infra* ¶ 46. But the legislature can be seen as making that determination only where it left room for such supplementation. Here it left no such room.

[11] *See Harper v. Lucas* (*In re Estate of Lucas*), No. ADM 1327-03, 2005 WL 674682, at *7–8 (D.C. Super. March 22, 2005) ("The legislature of the District of Columbia has . . . provided a comprehensive set of laws for intestate succession . . . . This Court is of the opinion that it should not use its equity power to disturb the District's statutory scheme. . . . Whether to permit inheritance by one who is neither the natural nor the adopted child of an intestate is a policy issue for the legislative branch.").

[12] *See* UNIF. PROBATE CODE, art. II, pt. 1 gen. cmt. (1969) (stating that the Probate Code is a gap filler meant "to reflect the normal desire of the owner of the wealth as to the disposition of his property at death"); Joel R. Glucksman, *Intestate Succession in New Jersey, Does it Conform to Popular Expectations?*, 12 COLUM. J. L. & SOC. PROBS. 253, 266 (1976) (stating that intestacy laws "pattern what people desire to do in distributing an estate").

[13] The question whether the decedent in this case "would likely have preferred to leave his estate to an individual whom the decedent raised as his own child rather than to distant relatives,"

thority to second-guess that decision.[14] Doing so would substitute our preference for that of the legislature. It would also override the presumptive preference of the decedent, who is entitled to presume that absent a will his estate will pass in accordance with the detailed scheme enacted by the legislature, and not with the second-guesses of a court.[15]

¶32 Thus, equitable adoption "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of [the legislature]" in enacting the Probate Code. *In re Adoption of A.B.*, 2010 UT 55, ¶ 33. The two cannot coexist. And when a

---

*infra* ¶ 47, is a matter beyond our capacity to resolve on this record. As an appellate court we are in no position to engage in such speculation. And in any event the question is withheld from us by the terms of the Probate Code.

[14] It is certainly true, as the dissent suggests, that "the legislature can amend the statute to direct a different outcome in future cases" if it "disapproves" of the way we tinker with its statutory enactments. *See infra* ¶35. But the availability of a legislative self-help remedy is of little consequence. We are tasked with interpreting the legislature's handiwork by our best lights. It is not enough to offer a merely plausible construction in the anticipation that the legislature will override us if we mistake its intent.

It may be that "[s]tate courts and state legislatures function in dialogue with one another." *See infra* ¶ 35. But in this dialogue and in this context, when the legislature speaks, we must listen. We cannot properly speak over the legislature's voice on this matter. And though we may be free to "call the attention of the legislature to statutes in need of clarification or modernization," *see infra* ¶ 35, we should not force such changes on the legislature by judicial mandate.

[15] The dissent posits that equitable adoption *may* represent the wishes of some decedents and *may not* prolong all estate proceedings. *See infra* ¶¶ 47–48. But this hedging is significant; it ultimately supports the conclusion that equitable adoption adds uncertainty and complexity to the intestacy scheme.

statute and common law principle butt heads, the common law must yield.

### III

¶33 We accordingly jettison the doctrine of equitable adoption as a vestige of a common-law friendly intestacy regime that has been overtaken by statute. Thus, we hold that the administration of Hannifin's estate is subject to the express terms of the Probate Code, including terms governing matters of distribution and representation. We reverse and remand for further proceedings consistent with this opinion.

_____

JUSTICE DURHAM, dissenting:

¶34 I disagree with the majority's conclusion that it is "impossible" to follow both the doctrine of equitable adoption and Utah's version of the Uniform Probate Code (Probate Code or Code). *See supra* ¶ 16.

¶35 State courts and state legislatures function in dialogue with one another and serve as checks on one another's power—alternately reinforcing, calling into question, and even reversing the other's law-making activities. In the words of one commentator, we live in a "world where common and statutory law are woven together in a complex fabric." David L. Shapiro, *Continuity and Change in Statutory Interpretation*, 67 N.Y.U. L. Rev. 921, 937 (1992). When courts fill interstices in statutory law in a manner the legislature disapproves of, the legislature can amend the statute to direct a different outcome in future cases. *See, e.g., Gressman v. State* [forthcoming] (noting that in response to the district court's holding, the legislature amended the Post-Conviction Remedies Act to clarify that claims expire on the claimant's death). Similarly, the legislature can overrule or preempt common law doctrines by statute. *See, e.g., Bishop v. GenTec Inc.*, 2002 UT 36, ¶ 12, 48 P.3d 218 (holding that the Liability Reform Act preempted in part the common law doctrine of respondeat superior). Although courts cannot overrule statutory law on the basis of policy, they are responsible for determining the constitutionality of challenged statutes. *See, e.g., Gallivan v. Walker*, 2002 UT 89, ¶¶ 64, 83, 54 P.3d 1069 (holding that the multi-county signature requirement for initiatives violated the uniform operation of laws clause and the federal equal protection clause). Additionally, courts can call the at-

JUSTICE DURHAM, dissenting

tention of the legislature to statutes in need of clarification or modernization. *See, e.g., McArthur v. State Farm Mut. Auto. Ins. Co.*, 2012 UT 22, ¶¶ 40–47, 274 P.3d 981 (Durham, J., concurring) (urging the legislature to revisit the uninsured motorist statute).[1]

¶36 Given the dynamic nature of the state law-making process, we assume, absent a contrary indication, that the legislature intends its statutes to work in tandem with our case law, and we reconcile the common law with statutory law whenever possible. *See Olseth v. Larson*, 2007 UT 29, ¶ 39, 158 P.3d 532 ("We presume the Legislature is aware of our case law . . . ."); *see also Bishop*, 2002 UT 36, ¶ 10 ("[T]he common law must necessarily give way" to statutory law only when the two are "in conflict" or when the legislature intended to preempt the common law.). Conflict preemption occurs only "where it is impossible . . . to comply with both [the common law] and [statutory] requirements, or where [the common law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of [the legislature]." *Navajo Nation v. State (In re Adoption of A.B.)*, 2010 UT 55, ¶ 33, 245 P.3d 711 (first alteration in original) (internal quotation marks omitted).

¶37 When the legislature enacted the Probate Code thirty-eight years ago, 1975 Utah Laws 579–715, it included the following section, which has not been amended: "Unless displaced by the particular provisions of this code, the principles of law and equity supplement its provisions," UTAH CODE § 75-1-103. The legislature instructed the judiciary not to infer preemption just because the legislature had spoken on a subject. Rather, courts are to find preemption only where the Probate Code directly "displace[s]" a common law doctrine. At the time the Code was enacted with this presumption against preemption, equitable adoption had been the law in Utah for fifteen years. *In re Williams' Estates*, 348 P.2d 683 (Utah 1960). Yet nothing in the original Probate Code or its subsequent amendments either addresses or conflicts with equitable adoption.

---

[1] Evidentiary and procedural rule-making is another arena where the courts and the legislature interact, with the supreme court having primary authority and the legislature the power to amend rules. See UTAH CONST. art. 8, § 4.

## I. THE PROBATE CODE'S DEFINITIONS OF "CHILD" AND "PARENT" DO NOT UNDERMINE THE DOCTRINE OF EQUITABLE ADOPTION

¶38 The majority seems to recognize that equitable adoption was valid as a common law doctrine before the Code was enacted. *See supra* ¶¶ 17, 24. In the majority's view, equitable adoption and the previous probate code could coexist because the previous probate code did not define the terms "child" or "parent."[2] The majority holds that the Uniform Probate Code's definitions of "child" and "parent," quoted above in paragraph 19, are preemptive. *See supra* ¶¶ 19–21.

¶39 Contrary to the majority's view, these definitions are not preemptive because the doctrine of equitable adoption is not premised on our ability to judicially define the statutory term "child" or "parent." The version of the probate code in effect when *Williams' Estates* was decided provided for intestate succession by a decedent's "child" or "issue." UTAH CODE § 74-4-5(1)–(2) (1953). We did not reach our holding in *Williams' Estates* by judicially defining these statutory terms, as the majority suggests. *See supra* ¶ 20. Instead, we exercised our equitable power to hold that, even though the claimant was not a "child" or "issue" under the statute, justice required awarding her the same inheritance she would have received if she had been adopted. *See In re Williams' Estates*, 348 P.2d 683, 684 (Utah 1960). Nothing in the Uniform Probate Code definitions changes our ability to do that.[3] Equitable adoption has always operated in parallel with the probate code, providing a non-statutory, equitable right to inherit as if the claimant were the child of the decedent. *See id.*

---

[2] The majority refers to the previous version of the probate code as an "open-ended system." *Supra* ¶ 17. This characterization is surely exaggerated. The probate code in effect when *Williams' Estates* was decided addressed intestate succession in as much detail as the Code provisions quoted in paragraph 18. *Compare* UTAH CODE § 75-2-103 (2013) with UTAH CODE § 74-4-5 (1953).

[3] Even if equitable adoption were a judicial method of interpreting the statutory term "child," it would be difficult to find preemptive intent in the Code's exclusion of foster children and grandchildren because *Williams' Estates* did not involve these categories of individuals.

18

JUSTICE DURHAM, dissenting

¶40 The majority further holds that equitable adoption conflicts with the Probate Code because it leads to a different distribution of estate assets than the intestacy provisions would otherwise dictate. *Supra* ¶ 21. But supplemental legal and equitable principles—explicitly invited by the legislature in Utah Code section 75-1-103—almost always alter the outcomes of the cases to which they are applied. Otherwise, there would be no reason to apply them. Courts in Utah and other states that have adopted the Uniform Probate Code have supplemented it in several outcome-determinative ways. *See Berneau v. Martino*, 2009 UT 87, ¶ 10, 223 P.3d 1128 (allowing the equitable discovery rule to toll the three-year statute of limitations required in the Probate Code); *Morgan v. Zion First Nat'l Bank* (*In re Estate of Pepper*), 711 P.2d 261, 263 (Utah 1985) (holding that final closing orders in a probate proceeding can be vacated through a rule 60(b) motion, despite the fact that section 75-3-1001 of the probate code "discharges a personal representative from further claim or demand after a final closing order has been entered"); *In re Estate of Butler*, 444 So. 2d 477, 479 (Fla. Dist. Ct. App. 1984) (estopping the first wife of decedent from asserting her inheritance rights as against the decedent's second wife); *In re Estate of Peter C.*, 488 A.2d 468, 470 (Me. 1985) (holding that the common law rule that a guardian is in a fiduciary relationship to his ward was not abrogated by the adoption of the Uniform Probate Code even though the code does not shoulder guardians with fiduciary responsibilities); *In re Estate of Foster*, 699 P.2d 638, 645 (N.M. Ct. App. 1985) (applying the equitable rule "authoriz[ing] an award of attorney fees for services rendered which confer a benefit upon the estate"); *In re Estate of O'Keefe*, 583 N.W.2d 138, 140 (S.D. 1998) (holding that the circuit court had the equitable authority to partially disqualify a beneficiary from inheriting from an estate because of his fraudulent acts); *see also In re Estate of Wagley*, 760 P.2d 316, 319-20 (Utah 1988) (holding that a claim of quantum meruit was appropriate in a probate case because under section 103, "principles of law and equity supplement the provisions of the [Utah Uniform Probate Code] unless displaced by particular provisions of the Code").

¶41 More specifically, several states that have enacted the Uniform Probate Code recognize equitable adoption. *See, e.g., Calista Corp. v. Mann*, 564 P.2d 53, 61 & n.18 (Alaska 1977) (holding that Alaska's version of Utah Code section 75-1-103 permitted the court to recognize equitable adoption); *In re Estate of Jenkins*, 904 P.2d 1316, 1320 (Colo. 1995) (en banc) (acknowledging that the state recognizes equitable adoption); *Jolley v. Seamco Laboratories,*

*Inc.*, 828 So. 2d 1050, 1051 (Fla. Dist. Ct. App. 2002) (same); *Johnson v. Johnson*, 617 N.W.2d 97, 101 (N.D. 2000) (same). I am aware of no case in which a litigant has argued or a court has held that equitable adoption is incompatible with the Uniform Probate Code.

¶42 Because the doctrine of equitable inheritance has never relied on the absence of a definition of "child" or "parent" in the probate code, and because equitable principles are almost always outcome-determinative where applied, I would hold that the Uniform Probate Code's definitions of "child" and "parent" do not conflict with the doctrine of equitable adoption.

## II. THE PROBATE CODE'S RULE THAT ADOPTED CHILDREN CANNOT INHERIT FROM THEIR BIOLOGICAL PARENTS IS IRRELEVANT TO THE DOCTRINE OF EQUITABLE ADOPTION

¶43 The majority also finds preemption based on the Probate Code's rule that "for purposes of intestate succession . . . [a]n adopted individual is the child of the adopting parent . . . and not of the natural parents." UTAH CODE § 75-2-114(1)-(2); *see supra* ¶¶ 22–27. The majority correctly states that claimants who inherit under the doctrine of equitable adoption could also inherit from their biological parents because "the doctrine of equitable adoption . . . is purely beneficial to the child and in no way alters the legal relationship between the claimant and the decedent or between the claimant and the biological parents." *Supra* ¶ 22; *see* Tracy Bateman Farrell, Annotation, *Modern Status of Law as to Equitable Adoption or Adoption by Estoppel*, 122 A.L.R.5th 205, § 2[a] (2004). I agree with this assessment. But the necessary implication of the "purely beneficial" nature of equitable adoption is that Utah Code section 75-2-114(2) is irrelevant to our preemption inquiry. In a case of equitable adoption, there is no "adopted person" and no "adopting parent."

¶44 The majority seems to have derived its own version of a fairness principle from this Code section that would prevent individuals from inheriting both from their biological parents and from other adults who perform parental duties. However, the intestacy statutes allow individuals to inherit from a wide range of relatives. The Probate Code does not contain a one-person-one-inheritance rule. Section 75-2-114 simply clarifies the effect of a

statutory adoption—which has no relation to the inaptly named doctrine of equitable adoption[4]—on intestate succession.

## III. THE STATED OBJECTIVES OF THE PROBATE CODE ARE NOT IN CONFLICT WITH THE DOCTRINE OF EQUITABLE ADOPTION

¶45  I disagree with the majority's emphatic conclusion that equitable adoption frustrates the following "underlying purposes and policies" of the Probate Code:

> (a) To simplify and clarify the law concerning the affairs of decedents, missing persons, protected persons, minors, and incapacitated persons;
>
> (b) To discover and make effective the intent of a decedent in distribution of his property;
>
> (c) To promote a speedy and efficient system for administering the estate of the decedent and making distribution to his successors; . . .
>
> (e) To make uniform the law among the various jurisdictions.

UTAH CODE § 75-1-102(2).

¶46  The majority's strongest point is that equitable inheritance adds uncertainty to the determination of an intestate decedent's heirs, in frustration of objective (a). A claim of equitable adoption does indeed require a court to consider evidence for and against the claim. But any of the legal and equitable principles with which the legislature has invited courts to supplement the Probate Code could be viewed as adding "uncertainty, complexity, and inefficiency." *See supra* ¶ 29. The legislature evidently is willing to tolerate a degree of complication in furtherance of a just and equitable outcome.[5]

---

[4] The presence of the word "adoption" in the phrase "equitable adoption" falsely suggests a relationship between this doctrine and statutory adoption. I prefer the term "equitable inheritance" because it is more descriptive of the specific relief that ought to be available to claimants in limited circumstances and does not suggest itself as a basis for other rights and duties associated with adoption.

[5] As a side note, I do not share the majority's general skepticism of state common-law development. *See supra* ¶¶ 30–31. Incremen-

¶47 The remaining objectives could be furthered or hindered by equitable adoption, depending on the circumstances of individual cases. As to objective (b), the majority notes that the "presumptive preference" of a decedent who dies intestate is for assets to be distributed according to the Probate Code. *Supra* ¶ 31. However, a decedent could also rely on the common law doctrine of equitable adoption found in *Williams' Estates*, which has been binding law in Utah for over fifty years. Furthermore, in a case like the present one, a decedent would likely have preferred to leave his estate to an individual whom the decedent raised as his own child rather than to distant relatives with whom he might not have had any personal relationship.

¶48 As to objective (c), equitable adoption will likely prolong many but not all estate proceedings in which it is claimed. In this case, if the viability of the doctrine had not been challenged, it may have been speedier and more efficient to award the entire estate to Mr. Nakai than to trace the decedent's bloodlines to distant relatives, painstakingly calculate each relative's share, and distribute the estate (including personal and real property) among nineteen individuals.

¶49 Regarding objective (e), the goal of uniformity would be furthered slightly more by retaining the doctrine of equitable adoption than by overruling it. Approximately half of the states recognize equitable adoption, but of the state courts to have directly considered the doctrine, significantly more than half have adopted it. *See* Tracy Bateman Farrell, Annotation, *Modern Status of Law as to Equitable Adoption or Adoption by Estoppel*, 122 A.L.R.5th 205 (2004). This trend suggests that equitable adoption will continue to grow in acceptance.

¶50 Equitable adoption does not categorically frustrate the purposes of the Probate Code. Neither these stated objectives nor the other Code provisions analyzed above provide a basis for overruling the doctrine. Because no "particular provisions" of the Probate Code have "displaced" equitable adoption, *see* Utah Code § 75-1-103, I would allow the doctrine to continue to coexist with statutory law, as it has done for over fifty years. Given the majority's foreclosure of this outcome, however, I would encour-

---

tal change through resolution of the questions posed by individual cases is the *sine qua non* of the common law. *See* Judith S. Kaye, *State Courts at the Dawn of a New Century*, 70 N.Y.U. L. Rev. 1, 5 (1995).

JUSTICE DURHAM, dissenting

age the legislature to consider the policy arguments in favor of its specific inclusion in the Code.

———————