In the Supreme Court of Georgia

Decided: March 16, 2015

S14A1314. SANDERS v. RILEY.

NAHMIAS, Justice.

This case involves a dispute between appellant Shalanda Sanders, née Riley ("Shalanda"), and her purported biological half-brother, appellee Curtis Riley ("Curtis"), over the estate of Clifford "Colonel" Riley ("Mr. Riley"), who died without leaving a will. Shalanda claims the right to inherit from Mr. Riley as a child born during the marriage of her mother and Mr. Riley and, alternatively, based on the equitable doctrine known as "virtual adoption." Curtis filed a motion for partial summary judgment on the issue of virtual adoption, arguing that there is insufficient evidence of an agreement by Mr. Riley to adopt Shalanda and the required partial performance of that agreement.

The trial court granted Curtis's motion. In doing so, however, the court did not view the evidence and draw reasonable inferences from it in the light most favorable to Shalanda as the party opposing summary judgment, and consequently erred in concluding that Curtis had shown that there was no

genuine issue as to any material fact regarding virtual adoption. The court also misinterpreted the requirement of partial performance of the agreement to adopt and erroneously concluded that an established virtual adoption can be undone by showing that the child formed a relationship with her natural father after she learned of his existence when she was a teenager. Accordingly, we reverse the grant of partial summary judgment to Curtis.

1.    As this appeal is from a ruling on a motion for partial summary judgment, "there have not yet been factual findings by a judge or jury, and [Shalanda's] version of events (unsurprisingly) differs substantially from [Curtis's] version." Scott v. Harris, 550 U.S. 372, 378 (127 SCt 1769, 167 LE2d 686) (2007). In this posture, courts must view the evidence and draw reasonable inferences from it in the light most favorable to the party opposing summary judgment. See Smith v. Ellis, 291 Ga. 566, 567 (731 SE2d 731) (2012). See also Cowart v. Widener, 287 Ga. 622, 624 (697 SE2d 779) (2010) (explaining that "[s]ummary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met"). So viewed, the record shows as follows.

2

In 1964, Mr. Riley married Corine Mathis ("Mrs. Riley"), and three children were born during the marriage: Ernestine in 1966, Curtis in 1969, and Shalanda in 1978. By the time Shalanda was born, Mr. Riley had not resided in the marital home for about three years, and Mrs. Riley had begun an affair with Roy Neal Warren ("Mr. Warren"). According to Mr. Warren:

> Corine Riley, Colonel Riley and I all knew when Corine was pregnant [with Shalanda] that she was in all likelihood pregnant with my child. Corine was married to Colonel at that time. When Shalanda was born, Colonel, Corine and I talked and I agreed Colonel would be her legal father. He and Corine were to raise her and I agreed to them having her. I remember Colonel went to Americus to the hospital after we talked and he had his name put on [Shalanda's] birth certificate.

Mr. Riley treated Shalanda the same way that he treated Ernestine and Curtis; he held Shalanda out as his daughter, and she in turn held him out as her father. Mr. Riley did not return to live at the marital home until after the children were grown, but he visited Mrs. Riley and the children there two to three times a week on average and assisted Mrs. Riley with whatever needed to be done for the children, including providing Shalanda with health insurance. Shalanda grew up believing that Mr. Riley was her natural (biological) father.

In 1992 or 1993, when Shalanda was 14, Mrs. Riley told her that Mr.

Riley was not her natural father. Mrs. Riley told Shalanda that Mr. Warren was her natural father and introduced Shalanda to Mr. Warren. Prior to that time, Shalanda had no contact with Mr. Warren and he did not support her, financially or otherwise. Shalanda asked her mother why, if Mr. Riley was not her natural father, she carried his last name and he was listed as the father on her birth certificate. Mrs. Riley explained that Mr. Warren was merely her natural father; it was Mr. Riley's idea to list himself as the father on her birth certificate and for Shalanda to carry his last name instead of Mr. Warren's; and Mr. Riley told Mrs. Riley to treat all three children the same and said that he did not want there to be any differentiation between Shalanda and the two older children.

Mr. Warren visited Shalanda once or twice in the year after she was introduced to him. In 1995, when Shalanda was 16, she ran away from home, and Mr. Warren allowed her to stay with him for a few weeks until Mrs. Riley apparently instituted a proceeding for child support and paternity against him, after which Shalanda was returned home. Shalanda then had no contact with Mr. Warren for the next few years. In the late 1990's, after Shalanda had gone off to college, she reconnected with Mr. Warren because she felt badly about the way that she left his home when she was 16. Shalanda spoke to and saw Mr.

4

Warren only occasionally during her early to mid-20's. Shalanda's sister Ernestine died in 2004.

In 2007, when Shalanda was 28, she was engaged to be married. Mr. Riley and Mrs. Riley put notices in two local newspapers announcing the engagement of "their daughter," and the wedding invitations described Shalanda as the child of Mr. Riley and Mrs. Riley. Shalanda invited Mr. Warren to the wedding. To symbolize "that he was the person who created me, the reason why I'm in this world," she had Mr. Warren walk her halfway down the aisle before handing her off to Mr. Riley, who then walked her the rest of the way and "gave [her] away" to the groom.

Shalanda never considered Mr. Warren to be her father. Instead, she considered Mr. Riley to be her father. According to Shalanda, the relationship that she developed later in life with Mr. Warren was not father-daughter in nature. Like Ernestine and Curtis, Shalanda called Mr. Riley "Bubba." Shalanda called Mr. Warren by his middle name, "Neal."

In December 2009, Mr. Riley moved back into the marital residence with Mrs. Riley. In August 2010, Mrs. Riley suffered a stroke that left her with poor eyesight and unable to drive. On January 30, 2011, Mrs. Riley transferred title

5

to her 2006 Cadillac Escalade and her 1990 Mercedes-Benz to Shalanda. For reasons that are unclear from the record on appeal, on February 18, 2011, Mrs. Riley shot and killed Mr. Riley and then herself. Shalanda paid for the joint funeral, which took place on February 21, 2011, and she listed herself as Mr. Riley's child on his death certificate. Shalanda saw Mr. Warren at the funeral and later invited him to a housewarming party, which he attended.

Mrs. Riley had a will, but Mr. Riley did not, and each had multiple life insurance policies.[1] On April 18, 2011, Shalanda and Curtis obtained form affidavits from Stonebridge Life Insurance Company ("Stonebridge") and American General Assurance Company ("AGAC") to collect the proceeds from some of Mr. Riley's life insurance policies. Shalanda and Curtis completed the affidavits together, swearing under penalty of perjury that they were the "children" and "heirs" of Mr. Riley, and the affidavits were submitted to the

---

[1] Mrs. Riley's will is not in the record, but testimony indicates that Shalanda was a major beneficiary. Although Mr. Riley appears to have predeceased his wife, it is not clear whether Mrs. Riley would be entitled to inherit part of his estate. See OCGA § 53-2-1 (c) (1) ("Upon the death of an [intestate] individual who is survived by a spouse . . . [and] also survived by any child or other descendant, the spouse shall share equally with the children . . . ; provided, however, that the spouse's portion shall not be less than a one-third share."). But see OCGA § 53-1-5 (a) ("An individual who feloniously and intentionally kills . . . another individual forfeits the right to take an interest from the decedent's estate . . . . For purposes of this Code section, the killing . . . is felonious and intentional if the killing would constitute murder or felony murder or voluntary manslaughter under the laws of this state."). We express no opinion on this issue.

6

insurance companies. Thereafter, Curtis began to dispute Shalanda's claim to inherit from Mr. Riley. On October 21, 2011, Stonebridge filed a complaint in interpleader in Macon County Superior Court against Shalanda and Curtis and later deposited the proceeds from Mr. Riley's Stonebridge life insurance policies into the registry of the court; two months later, AGAC did the same. See OCGA §§ 9-11-67, 23-3-90.

On November 14, 2011, Curtis filed a petition for letters of administration over Mr. Riley's estate in the Macon County Probate Court. The petition was not served on Shalanda, nor did it mention that she claimed an interest in Mr. Riley's estate. On December 29, 2011, Shalanda filed a motion to intervene and request for heir determination in the probate court, asserting an interest in Mr. Riley's estate both as a child born to the marriage of Mr. Riley and Mrs. Riley, see OCGA § 19-7-20 (a) ("All children born in wedlock or within the usual period of gestation thereafter are legitimate."), and, alternatively, based on Mr. Riley's agreement to be her legal father. The probate court transferred the case to the superior court ("trial court") in light of the two interpleader actions pending there.

On January 27, 2012, Curtis answered Shalanda's motion to intervene and

request for heir determination, denying that she had a cognizable interest in Mr. Riley's estate. Written discovery ensued, and Shalanda and Curtis were deposed on March 8, 2012. Shalanda testified in her deposition that she had not seen Mr. Warren since her housewarming party a year earlier.

On May 10, 2012, Curtis filed a motion for partial summary judgment limited to Shalanda's equitable claim of virtual adoption, arguing that she could not show the existence of an agreement by Mr. Riley to adopt Shalanda or the partial performance necessary to sustain a virtual adoption claim. See Cowart, 287 Ga. at 623 (explaining that to prevail on a motion for summary judgment, a defendant who will not bear the burden of proof at trial need not affirmatively disprove the plaintiff's claim but may point out by reference to evidence in the record the absence of evidence to support an essential element of the claim). Shalanda filed a response and Curtis filed a reply and an amended reply. On November 20, 2012, the trial court held a hearing on Curtis's motion and requested additional briefs, which Curtis and Shalanda then filed.

On January 22, 2013, the trial court entered an order granting partial summary judgment to Curtis on Shalanda's claim for equitable relief in the form of virtual adoption. The court concluded that there was no clear and convincing

evidence of "a specific agreement to adopt by Colonel Riley" or "a severance of [Shalanda's] relationship with her biological father," Mr. Warren. The court noted that Shalanda's entitlement to a share of Mr. Riley's estate therefore would depend solely on her legal claim under OCGA § 19-7-20 (a). Shalanda filed a timely notice of appeal directed to the Court of Appeals, see OCGA § 9-11-56 (h) (authorizing direct appeal of orders granting partial summary judgment), which properly transferred the appeal to this Court based on our jurisdiction over equity cases, see Morgan v. Howard, 285 Ga. 512, 512 (678 SE2d 882) (2009).

2.     The equitable remedy of "virtual adoption" has been recognized in Georgia for more than a century. See Crawford v. Wilson, 139 Ga. 654 (78 SE 30) (1913). In Crawford, this Court held:

> A parol obligation by a person to adopt the child of another as his own, accompanied by a virtual though not a statutory adoption, and acted upon by all parties concerned for many years and during the obligor's life, may be enforced in equity upon the death of the obligor, by decreeing the child entitled as a child to the property of the obligor, undisposed of by will.

Id. at 654. Thus, this equitable remedy is applied only after the death of the person who agreed to adopt the child (whom we will call the "adopting parent")

9

and when there has been no legal (statutory) adoption.  The child, who is often an adult by that time, is allowed to invoke the doctrine of virtual adoption "to avoid an unfair result from the application of intestacy statutes." Williams v. Murray, 239 Ga. 276, 276 (236 SE2d 624) (1997).

"Before a recovery based upon an alleged oral contract to adopt will be authorized, proof of such contract must be made out so clearly, strongly and satisfactorily 'as to leave no reasonable doubt as to the agreement.'" Rhodes v. Quantrell, 227 Ga. 761, 761 (183 SE2d 207) (1971) (citation omitted).[2]  It is not necessary, however, for the parties to use the word "adopt" or any other technical term in their agreement.  See Toler v. Goodin, 200 Ga. 527, 539 (1946).  As we explained in Anderson v. Maddox, 257 Ga. 478 (360 SE2d 590) (1987):

> The law does not require technical words or formality in execution of agreements in these cases.  It is not necessary that the parties be much acquainted with the law.  It is the nature of their intended and agreed upon provision for the child in question which controls.

Id.  In addition to proof of an agreement to adopt, there must be clear and convincing proof of partial performance by the parties to the agreement, with the

---

[2] The contract to adopt may also be written.  See, e.g., Williams, 239 Ga. at 277.

biological parent interrupting his or her actual relationship with the child (often referred to as "severance") and the adopting parent caring for the child or otherwise acting as if he or she was the child's parent. See Crawford, 139 Ga. at 658; Rhodes, 227 Ga. 761.

Despite its name, virtual adoption does not result in a legal adoption or the creation of a legal parent-child relationship. See Baker v. Henderson, 208 Ga. 698, 702 (69 SE2d 278) (1952) ("Virtual adoption is not adoption.").[3] Indeed, the virtually adopting parent must be dead before the remedy can be invoked, or the legal remedy of statutory adoption would be available, precluding this equitable relief. See OCGA § 23-1-4 ("Equity will not take cognizance of a plain legal right where an adequate and complete remedy is provided by law . . . .").[4] Virtual adoption is a posthumous "legal fiction, a name given to a

---

[3] Virtual adoption is sometimes called "equitable adoption," "de facto adoption," "adoption by estoppel," or "specific performance of a contract to adopt." 7 Richard A. Lord, Williston on Contracts § 16:21 (4th ed. 2014). See Hill v. Nakai (In re Estate of Hannifin), 311 P3d 1016, 1027 n.4 (Utah 2013) (Durham, J., dissenting) ("The presence of the word 'adoption' in the phrase 'equitable adoption' falsely suggests a relationship between this doctrine and statutory adoption. I prefer the term 'equitable inheritance' because it is more descriptive of the specific relief that ought to be available to claimants in limited circumstances and does not suggest itself as a basis for other rights and duties associated with adoption."); Johnson v. Johnson, 617 NW2d 97, 101 (N.D. 2000) ("The doctrine of equitable adoption, despite its name, bears almost no relationship to a statutory legal adoption.").

[4] With regard to this interaction between legal and equitable relief, we note that Shalanda continues to seek legal relief under OCGA § 19-7-20 (a), even though, as the trial court noted, she

11

status arising from and created by a contract where one takes and agrees to legally adopt the child of another, but fails to do so." 1 Mary F. Radford, Redfearn on Ga. Wills & Administration § 9:4 (B) (7th ed. 2008). Equity, which considers "that done which ought to be done," OCGA § 23-1-8, will award the plaintiff child the equivalent from the deceased's estate as she would have received had the deceased legally adopted her. See Jones v. O'Neal, 194 Ga. 49, 52 (20 SE2d 585) (1942).

3.    The trial court said that "it would be difficult to suggest" that Mr. Riley entered into a contract to adopt Shalanda. It appears that the court reached this conclusion because it failed to view the evidence in the light most favorable to Shalanda, as the party against whom summary judgment was sought. The trial court's order does not state or otherwise indicate that the court was applying the summary judgment standard for reviewing the evidence in the record.[5]

_____

appears to concede that it is at least highly unlikely that she is the biological child of Mr. Riley. While the trial court might *deny* the equitable relief of virtual adoption on the ground either that the elements of such relief were not established or that an adequate remedy at law was available, Shalanda may not be *granted* equitable relief without a determination that she cannot obtain the same relief based on her legal claim.

[5] Although Shalanda bears the burden of proving the existence of a contract to adopt and partial performance by "clear and convincing" evidence, which may be a significant hurdle to

12

Viewed in the proper light, the evidence of an agreement to adopt Shalanda includes most prominently Mr. Warren's affidavit, which recounts a discussion that he had with Mr. Riley and Mrs. Riley when Shalanda was born, in which they agreed that Mr. Riley would be Shalanda's "legal father" and that Mr. and Mrs. Riley would raise the child, after which Mr. Riley drove to the hospital where Shalanda was born and had himself listed on Shalanda's birth certificate as her father. In addition, if Shalanda's deposition testimony is fully credited, as it must be given the procedural posture of this case, Mr. Riley was a frequent presence in the marital home, he supported Shalanda to the same extent that he supported Ernestine and Curtis, Shalanda used his surname and called him "Bubba" just as his other children did, and he publicly held her out as his child. Mr. Warren was entirely absent from Shalanda's life until she was 14 years old, and when at that time Mrs. Riley told Shalanda about him, she did

---

overcome at trial, this heightened standard of proof has only a limited effect at the summary judgment stage and does not alter the court's obligation to

> view the pleadings and evidence in the light most favorable to the nonmoving party, . . . accept the credibility of the evidence upon which the nonmoving party relies, . . . afford that evidence as much weight as it reasonably can bear, and to the extent that the moving party points to conflicting evidence, . . . discredit that evidence for purposes of the motion.

Johnson v. Omondi, 294 Ga. 74, 84-85 (751 SE2d 288) (2013) (Blackwell, J., concurring).

13

so in terms that corroborate Mr. Warren's affidavit, including saying that Mr. Riley had told her to treat all three children the same and that he did not want there to be any differentiation between Shalanda and the two older children. And even after Shalanda and Mr. Warren had contact, Mr. Riley held Shalanda out as his daughter in her wedding announcements and invitations. He walked Shalanda down the aisle at her wedding and "gave her" to the groom, and she coordinated and paid for Mr. Riley's funeral, listing herself as his daughter on his death certificate.

Taken together, these facts, and the reasonable inferences drawn from them, are clearly sufficient to defeat summary judgment on the issue of whether there was an unwritten contract for Mr. Riley to adopt Shalanda. See Anderson, 257 Ga. at 479 (holding that the testimony of a single witness, the plaintiff's aunt, that the plaintiff and his brother "went to live with [the decedents] as [their] children because they – I guess it was a mutual agreement. They [were] going to take them as [their] children and raise them," was sufficient to preclude summary judgment on a virtual adoption claim); Herring v. McLemore, 248 Ga. 808, 809 (286 SE2d 425) (1982) (holding that the evidence was sufficient for a jury to find a virtual adoption where the child's natural father placed the child

14

in the home of the deceased, the natural mother agreed for the child to remain there, and the deceased agreed that he would treat the child as his own child and then did so). Compare Ware v. Martin, 209 Ga. 29, 32 (70 SE2d 446) (1952) (holding that the evidence was insufficient for a jury to find an agreement to adopt based solely on evidence that the natural parents surrendered the child to the deceased and statements by him showing affection and a fatherly attitude towards the child and statements that she was his adopted daughter). The trial court noted that no prior Georgia case appears to involve an alleged virtual adoption by the child's "legal" father. However, while Mr. Riley may have been Shalanda's *presumptive* legal father because she was born while he was married to her mother, see OCGA § 19-7-20 (a), that presumption could be rebutted by clear proof that Shalanda was in fact Mr. Warren's child, see § 19-7-20 (b) – and the record indicates that such proof may have existed. Thus, the only way for Mr. Riley to *conclusively* establish himself as Shalanda's legal father would have been for him to statutorily adopt her, which would have required him to go to court and publicly acknowledge that he was a cuckold – a man with an adulterous wife. Under these circumstances, if Mr. Riley wanted to claim and raise Shalanda as his own child, as the evidence indicates he did, it is not hard

15

to understand why he would do so through a private agreement with his wife and her lover to virtually adopt their biological child. Nothing in the doctrine of virtual adoption precludes its application under these particular circumstances.

4. The trial court also concluded that Shalanda could not prevail because she could not demonstrate a "severance" of her parent-child relationship with Mr. Warren. Again, the court appears not to have viewed the evidence in the light most favorable to Shalanda, who stated in her deposition and pointed to other evidence in the record showing that her relationship with Mr. Warren was never father-daughter in nature. Moreover, the trial court misinterpreted the law concerning the partial performance of the contract to adopt that is necessary to invoke the doctrine of virtual adoption.

Citing Rhodes v. Quantrell, supra, and two later cases, Chambers v. Chambers, 260 Ga. 610 (398 SE2d 200) (1990), and Hulsey v. Carter, 277 Ga. 321 (588 SE2d 717) (2003), the trial court ruled that virtual adoption "requires termination of the parental relationship between the child and the natural father" and found that "there has been no such severance of that relationship between [Shalanda] and her natural father." In our virtual adoption cases, however, this

Court has focused on whether there has been a change in the child's status in which all the parties began acting as though the child had been adopted, not whether the child and the natural parent ever saw each other again. See Copelan v. Monfort, 153 Ga. 558, 560 (113 SE 514) (1922) (holding that a cause of action for equitable adoption was properly stated where the child left the home of her natural parents to live with a maternal aunt who was widowed pursuant to an agreement by the aunt to adopt her, notwithstanding the child's "occasional visit" home to see her natural parents). And even if a complete "severance" of the relationship between the natural parent and the child were required, that requirement was satisfied here. As explained above, the evidence as viewed in the light most favorable to Shalanda shows that from the time she was born until she was 14, Mr. Riley was the only father that she had; Mr. Warren was entirely absent, had no relationship with her, and provided her no support, financial or otherwise, until she was a teenager.

The three cases cited by the trial court are readily distinguished. Rhodes was an unusual case where an illegitimate child sought to invoke the doctrine of virtual adoption to inherit from his *natural* father despite growing up in the home of his mother and the man she later married; there was no issue in the case

17

of whether the natural father was involved enough in the child's life that the child could not inherit from someone else through virtual adoption. See Rhodes, 227 Ga. at 761-762. See also Prince v. Black, 256 Ga. 79, 80-81 (344 SE2d 411) (1986) (explaining that the doctrine of virtual adoption does not fit the situation where an illegitimate child is attempting to inherit from his natural father and establishing the similar but distinct doctrine of virtual or equitable legitimation). In Chambers, the plaintiff was born to a woman who was confined in a mental institution and placed in the deceased's home by a welfare agency; there was no evidence that the deceased agreed to adopt the plaintiff; the deceased filed a petition in court to have the child's name changed but specifically stated that the deceased was not adopting the child; and there was an affidavit from the mother denying that she voluntarily gave up custody or agreed for the plaintiff to be adopted. See Chambers, 260 Ga. at 611-612. Again, there was no dispute in the case regarding the degree of the natural parent's involvement in the child's life. Hulsey does discuss the degree of the natural father's involvement in the life of his legitimate child, but not in the context of partial performance of the alleged agreement to adopt. In Hulsey, there was no evidence that the natural father agreed to the plaintiff's adoption

18

by the natural mother's new husband. The plaintiff argued that the natural father's participation in the agreement was unnecessary because he abandoned her, and that was the context for the discussion of the ongoing relationship between the plaintiff and her natural father. See Hulsey, 277 Ga. at 322-323.

The trial court's focus seems to have been on what happened in the years after Shalanda and Mr. Warren first met, saying that "it is clear to this court that [Shalanda] and Roy Warren have maintained a relationship of child and biological father." But the evidence shows no actual relationship between Shalanda and Mr. Warren, much less one of child and parent, until Shalanda was a teenager. The trial court cited, and we have found, no authority for the proposition that once the child's status has changed in the course of a virtual adoption – where a contract to adopt has been partially performed – the child can then become "unadopted" simply by developing a relationship later in life with a natural parent. See Savannah Bank & Trust Co. v. Wolff, 191 Ga. 111, 121 (11 SE2d 766) (1940) (explaining that as a result of the contract to adopt followed by partial performance, "the whole status, position, and future of the child were altered irrevocably"). Just as children, once legally adopted, do not become unadopted by forming a relationship later in life with their biological

19

parents – something that is occurring with increasing frequency – children, once virtually adopted, do not become unadopted by developing a relationship later on with their biological parents.

For these reasons, the trial court erred in granting partial summary judgment to Curtis on Shalanda's equitable claim of virtual adoption.[6]

Judgment reversed.  All the Justices concur.

---

[6] Our holding makes it unnecessary to address Shalanda's other enumeration of error regarding the alleged conflict of interest of Curtis's original attorney in the case.