121 Utah 385 (1952)
242 P.2d 565
In re LEWIS' ESTATE.
MIDGLEY et al.
v.
DENHALTER et al.
No. 7724.
Supreme Court of Utah.
Decided April 1, 1952.
Elias Hansen, Salt Lake City, for appellant.
*386 Dwight L. King, Rawlings, Wallace, Black, Roberts & Black, all of Salt Lake City, for respondent.
WADE, Justice.
This proceeding was brought by William H. English to compel the administrator of the Estate of Mignon Denhalter Lewis who died intestate to include him as one of the heirs of her estate. The administrator had listed as heirs of the estate a sister of the deceased and three nephews, the lawful sons of Charles Henry Denhalter, a predeceased brother of the decedent. William H. English claims that his father, who is also deceased, was the natural son of this predeceased brother, Charles Henry Denhalter, and that the natural son had been legitimated by said Charles Henry Denhalter marrying the mother of this son a few months after his birth. This appeal is from a judgment of the court that William H. English was an heir and entitled to share in the distribution of the estate.
The record discloses that Mignon Denhalter Lewis died on September 5, 1949, and her brother Charles Henry Denhalter died on August 8, 1931. William Henry Johnson, who it is claimed was the natural son of Charles Henry Denhalter and the father of the claimant herein, died on April 29, 1937.
A Mr. William John Clark testified that his wife, who was deceased at the time of the trial, told him a baby boy was born in his home about December 29, 1904 and that the mother was Julia Rosa, a daughter of their cleaning woman. This child was in his home for about three days when it was taken by Mr. and Mrs. John Henry Johnston, friends of theirs, and subsequently adopted by the Johnstons as their son and was known as William Henry Johnston. Sometime in July or August 1905, after their marriage, Charles Henry Denhalter and the child's mother came to his home demanding the boy but he did not inform them where he was. When this boy was grown, he told him his *387 father was Charles Henry Denhalter and Denhalter became angry that he had given this information because he feared it would break up his new home. Mary Frances Johnston Loveless, a daughter of the Johnstons who adopted the boy born in the Clark home, testified that she had seen the mother of the boy when she was dressing him before he was taken by the Johnstons and that she was at the Clarks' home when the mother accompanied by a man came there and demanded the child. She also testified that she had found in her mother's chest a slip of paper which had written on it the names Julia Rosa and Charles Henry Denhalter and the baby's age. William Henry Johnston was the baby which the couple were demanding. Many years later, after William Henry Johnston was married, she told him and his wife that Charles Henry Denhalter was his father.
Julia Rosa and Charles Henry Denhalter were married on July 31, 1905 and divorced about five years later. Both subsequently married other spouses, Julia Rosa becoming Mrs. Hummel. The second Mrs. Denhalter testified that she first met Mr. and Mrs. William Henry Johnston in 1926 and that they were taken into their home then. Her husband wanted the boy's mother to meet him and asked her if it would be all right to invite Mrs. Hummel, who was living in California at that time, to come and visit with them. She told him to do as he saw fit and Mrs. Hummel did come and visit with them for a few months. The Johnstons later moved into a home of their own for which Mr. Denhalter paid the rent. William Henry Johnston proved to be unstable and about two or three months after the claimant herein was born, the Denhalters took Mrs. Johnston back into their home because her husband would not furnish her one and she was ill and needed help. There was evidence that Mrs. Johnston divorced William Henry Johnston and subsequently married a man named Alvin Ray English who adopted claimant, who was thereafter called William English.
*388 Appellants contend that the court committed prejudicial error when it allowed Mr. Clark to testify as to what his wife told him about the arrangements made for the birth of a child in his home which was to be given to the Johnstons for adoption and her declarations concerning the parentage of the baby boy born in their home. Appellants argue that Clark's testimony was inadmissible under the exception to the hearsay rule admitting evidence about pedigree because his wife, the declarant, was not related by blood or affinity to the family whose pedigree was brought into question.
The admittance of hearsay evidence in proving pedigree being based on necessity and the likelihood of its being true because the declarations were made at a time when there was no controversy, and the people most likely to have an interest and know the truth were relatives, some of the authorities limited the competence of such evidence to declarations by relatives on the assumption that their interest would lead them to know the truth and that they would not be likely to be mistaken. Since it is the apparent trustworthiness of the declaration which makes it acceptable, there appears to be no good reason in modern times why the admissible declaration should be limited to relatives. See Wigmore on Evidence, 3d Ed., Sec. 1487; Turner v. Sealock, 21 Tex. Civ. App. 594, 54 S.W. 358, where it was held that hearsay testimony of declarations of persons who had knowledge of a death was admissible, and In re Frey's Estate, 207 Iowa 1229, 224 N.W. 597, where the court in holding that the declarations of a person, not a relative, who had reared the claimant were admissible, quoted with approval the following from In re Estate of Carroll, 149 Iowa 617, 128 N.W. 929:
"* * * `It is sufficient to say that evidence relating to pedigree and genealogy, and family history, usually consists of hearsay, and presents an exception to the general rule on that subject. Such declarations are received in evidence as being the natural effusions of a party who must know the truth, and who speaks on an occasion when *389 his mind stands in an even position, without any temptation to exceed or fall short of the truth. Whitlock v. Baker, 13 Ves. 514. As a general rule such information or statements concerning which a witness may testify must have antedated the litigation and the controversy, so that they could not have been induced thereby. They must be ante litem motam.'
"The authorities lay down the general rule that in order for the declaration to be admissible, the declarant must be a relative, either by consanguinity or affinity. 22 C.J. 243. To this general rule there are well-recognized exceptions. Wigmore in his work on Evidence, § 1487, declares: `The required qualification, then, in general may be supposed to be present whenever (following the judicial phrases) there are found persons "likely to know the facts," "having an opportunity to know the facts," or "holding a relation rendering it very probable that he would learn them truly." If this is so, the line need not be drawn strictly at relatives.'" [207 Iowa 1229, 224 N.W. 599.]
See also A.L.I. Model Code of Evidence, Rule 524, which reads:
"(2) Evidence of a hearsay statement of a matter concerning the birth, marriage, divorce, death, legitimacy, race-ancestry, relationship by blood or marriage or other similar fact of the family history of a person other than the declarant
"(a) is admissible if the judge

* * * * *
"(i) finds that the declarant was related to the other by blood or marriage or finds that the declarant was otherwise so intimately associated with the other's family as to be likely to have accurate information concerning the matter declared, and made the statement as upon information received from the other or from a person related by blood or marriage to the other, or as upon repute in the other's family, and
"(ii) finds that the declarant is unavailable as a witness;".
Mrs. Clark, the declarant, was present at the birth of claimant's father; she is the one who made arrangements for the birth in her home. She had actual knowledge of the occurrence and when she made the declarations concerning its birth and who its mother was it was not in anticipation of litigation or any controversy concerning the facts. Under *390 such circumstances, the likelihood of her declarations being true are very great and, under the more liberal rule as recommended by Wigmore and the A.L.I. Model Code of Evidence and the holdings in the cases cited above, her declarations are admissible as an exception to the hearsay rule, she being deceased and unavailable at the trial, even though she was not related to the Denhalters. The court did not err in admitting this evidence and on the contrary his rulings were in accord with Rule 43(a), Utah Rules of Civil Procedure, which provides that:
"* * * In any case, the statute or rule which favors the reception of the evidence governs * * *."
From the evidence we have outlined above, it is clear that the evidence was sufficient to sustain the finding that William Henry Johnston, the father of the claimant, was the son of Julia Rosa and Charles Henry Denhalter. The court concluded that although William Henry Johnston was an illegitimate child the marriage of his natural parents legitimated him and therefore claimant as the heir of William Henry Johnston is entitled to share in the estate as his representative. In the trial court's memorandum of opinion it states that its conclusion that the marriage of William Henry Johnston's natural parents legitimated him is based on the provisions of Sec. 14-2-14, U.C.A. 1943, which reads:
"If the mother of any such child and the father shall at any time after its birth intermarry, the child shall in all respects be deemed to be legitimate, and the bond for its support shall thereupon become void."
Appellants argue that the court erred in applying the above statute under the facts of this case because that statute is part of the chapter on Bastardy and the words "such a child" can only refer to a child who has been judicially determined to be the child of the man who marries its mother. It is *391 argued that this must be so because prior to 1933 this statute read:
"If the mother of any bastard child and the reputed father shall at any time after its birth intermarry, said child shall in all respects be deemed to be legitimate, and the bond for the support of said child shall thereupon become void." U.C.L. 1917, Sec. 393.
And the amendment to make it read "any such child" could only have been made for the purpose of removing any ambiguity in the original language that the child referred to must be the one judicially determined to be the child of the man accused of being the father in bastardy proceedings. It is also argued that to hold otherwise would fail to give effect to the whole statute and to ignore the language therein providing that "the bond for its support shall thereupon become void."
We cannot agree with this reasoning. Sec. 14-2-1 of the Chapter on Bastardy dealing with the mother's or expectant mother's complaint and accusation of a person as the father of the child, describes the child as "such child" clearly meaning such illegitimate child and not one who has had someone judicially determined to be its father, because at that stage of the proceedings there can be no judicial determination. If the amendment was made to clarify any ambiguity, it was an ambiguity which made it possible for a court to construe it to mean that the marriage of a reputed father rather than the actual father with the mother would legitimate the child. The wording of Sec. 14-2-14, U.C.A. 1943, is clear and explicit and unambiguous. It provides that if the father and the mother of the illegitimate child intermarry at any time after its birth "the child shall in all respects be deemed to be legitimate". There are no conditions attached to such legitimation. In so holding, we do not ignore the further wording "and the bond for its support shall thereupon become void." That provision was obviously included to take care of a situation where the father had been compelled to *392 give a bond for the support of the child before his marriage to the mother. If there have been no proceedings compelling the father to give such a bond, that portion of the statute has no application. The fact that no bastardy proceedings were had against the father cannot affect the illegitimate child's status upon the marriage of its natural parents. The statute declares that upon such a happening it becomes legitimate. The court having found that Charles Henry Denhalter was the father of William Henry Johnston, it did not err in concluding that upon the marriage of Charles Henry Denhalter and Julia Rosa, he was legitimated for all purposes under the provisions of Sec. 14-2-14.
Affirmed. Costs to respondent.
McDONOUGH, and CROCKETT, JJ., concur.
WOLFE, Chief Justice (concurring in the results).
I concur in the results for the reasons stated in the opinion of Mr. Justice HENRIOD. I do not think this case requires that we open the door as wide as the majority would open it. When it is necessary to do so I may accede but I shall reserve such ruling at this time.
In regard to the contention of the appellants that the provisions of Sec. 14-2-14, U.C.A. 1943, apply only to a child who has been determined in a bastardy proceeding to be the offspring of the man who marries the child's mother, I make the following observation. It is unreasonable to think that the Legislature desired to extend legitimacy to a child determined in a bastardy proceeding to be the offspring of the man who marries the child's mother, but to withhold the stamp of legitimacy from a child determined in a proceeding to establish heirship to be the offspring of the man marrying the child's mother. While it is true that Sec. 14-2-14 is part of the chapter on bastardy, there is no reason why the Legislature should regard the findings of a court in a bastardy proceeding with more sanctity than the findings of a court in an action to *393 determine heirship. Both are civil actions and parentage can be proved in the same manner in both types of actions. In either type of case if the court finds that the man who marries the child's mother is the child's father, the child's status as to legitimacy should be the same. The important consideration is that it be judicially determined that the child is the offspring of the man marrying the child's mother. The type of proceeding in which such question is determined would seem to be immaterial. This seems particularly true in view of Sec. 14-4-12, U.C.A. 1943, legitimating children born out of wedlock but publicy acknowledged by their father as his offspring. Here the Legislature legitimated a class of children, the parentage of whom is not determined in any type of judicial proceeding.
HENRIOD, Justice (concurring in the result).
I concur in the result for the reason that there appears to be sufficient evidence to justify the decision without the hearsay testimony mentioned. But it is suggested respectfully that extending the pedigree exception to include because of the natural interest existing among relatives has its objections, despite its advocacy by eminent text-writers. The statement of a relative is likely to be true because of the natural nterest existing among relatives which places a cloak of trustworthiness about the statement. The same cannot be said of the statement of an unrelated, perhaps intimate third party, whose interest and the interest of his own relatives cannot possess anywhere near the same high quality and degree of concern that exists among relatives of the person whose status is in issue. It is not unreasonable to conclude, therefore, that extension of the exception, instead of promoting a safeguard for truthfulness, actually may tend to invite testimony of questionable veracity. In the situation involving a relative's declaration, counsel has a source of information for impeachment purposes by seeking out other living, interested relatives *394 likely to know the facts because of such relationship. The same source of information usually is denied counsel where the declarant was only an intimate, since his relatives would not have the same interest in knowing the facts because wholly unrelated to the person whose status is in issue. If a witness realizes, therefore, that impeachment is likely in the one case, but highly remote in the other, he would be less prone to fear the penalties of perjury when parroting the statements of a non-relative declarant.