**2021 UT 66**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

In re Estate of JOHN CLIFFORD HEATER

GINA MALLOUGH KIRKLAND
*Petitioner*,

*v.*

JOHN CARLON,
*Respondent*.

No. 20200441
Heard May 10, 2021
Filed November 12, 2021

On Certiorari to the Utah Court of Appeals

Second District, Farmington
The Honorable David M. Connors
No. 083700165

Attorneys:

Brent D. Wride, Salt Lake City, for petitioner

Ben W. Lieberman, Salt Lake City, for respondent

JUSTICE PETERSEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PEARCE joined.

JUSTICE PETERSEN, opinion of the Court:

### INTRODUCTION

¶1 Petitioner Gina Mallough Kirkland and her brother Garret Heater are co-personal representatives of the intestate estate of their deceased father John Clifford Heater (Heater).

Kirkland and Garret[1] have litigated the administration of the estate for a number of years. During this litigation, Respondent John Carlon intervened, claiming Heater was his biological father and that he is therefore an additional heir to Heater's estate. Genetic testing proved him right. And the district court entered an order determining that Kirkland, Garret, and Carlon are the heirs to Heater's estate. Kirkland appealed, and the court of appeals affirmed.

¶2    The case is now before us on certiorari. Kirkland argues that the establishment of a parent-child relationship in a probate case is governed by the Utah Uniform Parentage Act. And she contends that under the Parentage Act, Carlon's presumed father is not Heater but the man who was married to his mother at the time of his birth. She further argues that the Probate Code prohibits Carlon from inheriting from two fathers. We reject Kirkland's statutory arguments and affirm.

## BACKGROUND

¶3    John Clifford Heater died intestate in 2008. His daughter and son, Kirkland and Garret, were Heater's only known heirs at the time of his death and are the co-personal representatives of his estate.

¶4    In 2016, with the litigation over the estate still ongoing, Garret connected with John Carlon through social media. Garret told Carlon that he thought Carlon might be Heater's biological son.

¶5    When Carlon was born, his mother Myrol Carlon was married to Thomas Carlon. The two remained married until Thomas died in 2007. But Myrol used to work for Heater and had a sexual relationship with him during the time Carlon was conceived. According to Carlon, Heater treated him and Myrol "in a manner that was not consistent with merely an employer and employee," showing "great interest" in the two of them. For instance, Heater took Myrol to some of her prenatal appointments when she was pregnant with Carlon, bought her maternity

---

[1] Because several of the people involved in this case share the same last name, we refer to some individuals by their first name with no disrespect intended by the apparent informality.

clothes, and drove her to the hospital when she was in labor. Heater also paid for Carlon to have a live-in nanny as a child and sent Carlon birthday cards with $100 every year through Carlon's college years and marriage. This led Carlon to "suspect[] for years that John Clifford Heater could be [his] father."

¶6    After Garret and Carlon's social media discussion, Carlon moved to intervene in the probate case. He stated that he believed Heater was his biological father and, if true, that he was an heir to Heater's estate. Garret supported the motion but Kirkland opposed it.

¶7    The district court permitted Carlon to intervene for the limited purpose of obtaining DNA testing. The DNA test results confirmed that Garret and Carlon were biological half-siblings.[2] Carlon had previously submitted to the court DNA test results that established he and his purported biological brother (Thomas and Myrol's son) did not share the same biological father. Carlon then renewed his motion to intervene in the probate case, which Kirkland opposed and the district court granted.

¶8    Carlon moved for summary judgment, seeking (1) a determination that he was Heater's biological son and (2) an order determining the heirs to Heater's estate. The district court granted summary judgment in Carlon's favor, finding first that Heater was Carlon's biological father and ultimately entering an order naming Kirkland, Garret, and Carlon as the heirs to Heater's estate. Because the court had determined Carlon was Heater's biological son, the court's order said "no further proceedings [were] necessary" to determine heirship.

¶9    Kirkland appealed, arguing that the district court had erred in its interpretation of the Probate Code in two ways. She first argued that under the Probate Code, the parent-child relationship must be determined in accordance with the Parentage Act. *Kirkland v. Carlon (In re Est. of Heater)*, 2020 UT App 70, ¶ 8, 466 P.3d 728. And she asserted that under the Parentage Act, Carlon's father is presumed to be the man who was married to his mother at the time of his birth—Thomas Carlon—and it was too late for Carlon to rebut this presumption because Thomas is deceased. *Id.* ¶¶ 10, 17. Second, she argued that the Probate Code

_____

[2] Kirkland refused to submit to a DNA test.

prohibits a child from inheriting from more than one set of parents, so Carlon could not inherit from two fathers. *Id.* ¶¶ 8, 16–17. The court of appeals rejected these arguments and affirmed the district court. *Id.* ¶¶ 21–22.

¶10 Kirkland petitioned for certiorari, which we granted. We exercise jurisdiction under Utah Code section 78A-3-102(3)(a).

## STANDARD OF REVIEW

¶11 "On certiorari, this court reviews the decision of the court of appeals for correctness, giving no deference to its conclusions of law." *State v. Marquina*, 2020 UT 66, ¶ 24, 478 P.3d 37 (citation omitted).

## ANALYSIS

¶12 On certiorari, Kirkland contends the court of appeals erred in affirming the district court's order determining Carlon is Heater's child and an heir to Heater's estate.[3] But before we proceed to the merits of this matter, we must first address whether the court of appeals had jurisdiction to do so.

## I. JURISDICTION

¶13 Although the district court granted summary judgment to Carlon and entered an order determining heirs, there are still ongoing proceedings in the district court. And for an appellate court to have jurisdiction, there must be "no claims pending below." *WDIS, LLC v. Hi-Country Ests. Homeowners Ass'n*, 2019 UT 45, ¶ 23, 449 P.3d 171. This is known as the final judgment rule. *Id.* ¶ 21 ("Under what we refer to as the final judgment rule, an 'appeal is improper if it is taken from an order or judgment that is not final.'" (citation omitted)).

---

[3] Our order on certiorari identified the question for review as: "Whether the Court of Appeals erred in affirming the district court's construction and application of the Utah Probate Code and Uniform Parentage Act to allow Respondent John Carlon to *intervene* in the probate action and to determine he is an heir of John Clifford Heater." (Emphasis added.) However, Kirkland has not made an argument regarding Carlon's intervention in the probate matter, so no issue relating to intervention is before us.

¶14 There are three general exceptions to the final judgment rule: (1) "when the legislature provides a statutory avenue for appealing nonfinal orders," *Copper Hills Custom Homes, LLC v. Countrywide Bank, FSB*, 2018 UT 56, ¶ 13, 428 P.3d 1133 (citation omitted), (2) interlocutory appeals under rule 5 of the Utah Rules of Appellate Procedure, *id.* ¶ 14, and (3) a district court's certification under rule 54(b) of the Utah Rules of Civil Procedure, *id.* ¶ 15.

¶15 Kirkland's notice of appeal was not brought under any of these exceptions. But in the notice of appeal, she explained that because the order determining heirs said "no further proceedings are necessary to determine the heirs of the Estate of John Clifford Heater," it was "final for purposes of appeal" "[u]nder Utah's pragmatic case-by-case approach to finality in probate matters."

¶16 Both parties cite to precedent from the court of appeals supporting this pragmatic approach to determining finality in probate matters. *See, e.g.*, *Kelly v. West One Trust Co.* (*In re Est. of Morrison*), 933 P.2d 1015, 1016–17 (Utah Ct. App. 1997) (permitting an appeal of an order compelling an estate's heirs to return distributions despite ongoing claims in the district court because "Utah has effectively adopted [a] pragmatic, case-by-case approach to finality in probate matters"). And both Kirkland and Carlon argue that we have effectively endorsed such an approach, because *Kelly v. West One Trust Co.* (*In re Estate of Morrison*), relied on case law from this court concluding an order was final and appealable when it "'resolve[d] an issue of vital importance' and 'conclude[d] a major phase in the process of formal testacy proceedings.'" *Id.* at 1017 (alterations in original) (quoting *In re Est. of Christensen v. Christensen*, 655 P.2d 646, 648 (Utah 1982)); *see also id.* at 1016–17 (citing *First of Denver Mortg. Invs. v. C.N. Zundel & Assocs.*, 600 P.2d 521, 528 (Utah 1979); *Hayward v. Voorhees* (*In re Est. of Voorhees*), 366 P.2d 977, 980 (Utah 1961)).

¶17 But the cases upon which *In re Estate of Morrison* relied are in conflict with rule 5 of the Utah Rules of Appellate Procedure and rule 54(b) of the Utah Rules of Civil Procedure. And these rules are controlling. *See* UTAH R. APP. P. 1(a) ("These rules govern the procedure before the Supreme Court and the Court of Appeals of Utah in *all* cases." (emphasis added)); UTAH R. CIV. P. 1 ("These rules govern the procedure in the courts of the state of Utah in all actions of a civil nature . . . . These rules govern all actions brought after they take effect and all further

proceedings in actions then pending."); *see also Gillett v. Price*, 2006 UT 24, ¶¶ 7–9, 135 P.3d 861 (explaining that, where "the rules provide the source of available relief," our precedent that held otherwise was abrogated); *Strand v. Nupetco Assocs. LLC*, 2017 UT App 55, ¶ 4, 397 P.3d 724 ("Courts are, in short, bound by the text of the rule.").

¶18 The parties argue that the "pragmatic approach" is necessary in probate matters because such cases may effectively resolve after an important ruling, although the ruling does not trigger an entry of final judgment. However, we note that in such a scenario, an order resolving "an issue of vital importance" that did not result in an entry of final judgment could be a candidate for rule 54(b) certification or a petition for interlocutory appeal under appellate rule 5.

¶19 We take the opportunity to disavow the pragmatic test and clarify that a nonfinal order in a probate case may be appealed only through the mechanisms delineated in our civil and appellate rules or statutory exemptions.[4] Under the applicable procedural rules, Kirkland should have pursued an interlocutory appeal or sought a 54(b) certification from the district court judge. However, because she and Carlon relied on case law that allowed the appeal to go forward, our holding today is prospective only and we resolve this case on the merits. *See Merrill v. Lab. Comm'n*, 2009 UT 74, ¶ 5, 223 P.3d 1099 ("[T]he court may, in its equitable discretion, prohibit or limit retroactive operation of its ruling 'where the overruled law has been justifiably relied upon or where retroactive operation creates a burden.'" (citation omitted)).

---

[4] We do not dismiss the parties' arguments about the unique nature of probate matters and the more frequent need to appeal interlocutory orders. While we view civil rule 54(b) and appellate rule 5 as broad enough to address these circumstances, we recognize that probate practitioners have an important perspective and may see a need to refine these rules in the specific context of probate cases. If so, we encourage them to provide us or our appropriate standing committees with their concerns.

## II. DETERMINING THE PARENT-CHILD RELATIONSHIP FOR PURPOSES OF INTESTATE SUCCESSION

¶20 Because Heater died without a surviving spouse, his intestate estate is to be divided equally among his descendants per capita at each generation. *See* UTAH CODE § 75-2-103(1)(a). "Descendants" at each generation are first determined by "the relationship of parent and child at each generation." *Id.* § 75-1-201(9).

¶21 The dispute in this case centers on whether and how Carlon may establish a parent-child relationship with Heater under the Probate Code. The relevant provision of the Probate Code states that "for purposes of intestate succession . . ., an individual is the child of the individual's natural parents, regardless of their marital status. The parent and child relationship may be established as provided in Title 78B, Chapter 15, Utah Uniform Parentage Act." *Id.* § 75-2-114(1).

¶22 Kirkland argues that the final sentence of subsection 114(1) means that the parent-child relationship must be established in the manner provided in the Parentage Act. And she asserts that this disposes of Carlon's inheritance claim in two ways. First, she argues that under the Parentage Act, Thomas is presumed to be Carlon's father because he was married to Carlon's mother at the time of Carlon's birth. And she contends that the only way Carlon can rebut this presumption is through the applicable provisions of the Parentage Act. But she argues it is now too late for him to do so because Thomas is deceased. Second, she contends that even if DNA tests show that Heater is Carlon's biological father, the Probate Code does not allow Carlon to inherit from two fathers. And although Kirkland does not contend that Carlon actually inherited anything from Thomas, she argues that, as a legal matter, Carlon was Thomas's heir when Thomas died and this precludes him from also being Heater's heir.

¶23 We first conclude that the court of appeals correctly held that subsection 114(1) of the Probate Code does not require parentage to be determined only through the Parentage Act. Then we determine that, in any event, Carlon satisfied both the Probate Code and the Parentage Act in establishing a parent-child relationship with Heater. Finally, we explain that the statutory one-set-of-parents rule is inapplicable to this case.

*A. Subsection 114(1) of the Probate Code*

¶24 The Probate Code defines the parent-child relationship "for purposes of intestate succession." UTAH CODE § 75-2-114(1). Specifically, it states that "an individual is the child of the individual's natural parents, regardless of their marital status." *Id.* It then provides that "[t]he parent and child relationship may be established as provided" by the Parentage Act. *Id.*

¶25 Kirkland reads this reference to the Parentage Act in the second sentence of subsection 114(1) to mean that the Parentage Act governs the establishment of the parent-child relationship in a probate case, making the description of the parent-child relationship in the first sentence of subsection 114(1) irrelevant. We reject this argument. We agree with the court of appeals that the description of the parent-child relationship in subsection 114(1) stands on its own and is not overtaken by the subsequent reference to the Parentage Act. *See Kirkland v. Carlon* (*In re Est. of Heater*), 2020 UT App 70, ¶¶ 11–13, 466 P.3d 728. As we will explain, the Probate Code allows a person to establish a parent-child relationship either by meeting the terms of subsection 114(1) itself *or* by satisfying one of the definitions or methods in the Parentage Act.

¶26 The Probate Code does not mandate that parentage be determined only under the provisions of the Parentage Act. Kirkland bases her argument on a portion of the text of subsection 114(1): "[t]he parent and child relationship may be established as provided in [the Parentage Act]." UTAH CODE § 75-2-114(1). But as the court of appeals explained, this language is permissive because it uses the word "may." *See id.* § 68-3-12(1)(g) ("'May' means that an action is authorized or permissive."); *In re Est. of Heater*, 2020 UT App 70, ¶¶ 14–15. Accordingly, the Probate Code allows an individual to establish the parent-child relationship through the Parentage Act, but it does not require it.

¶27 And the Parentage Act does not claim to be the only way to establish parentage where another statute has its own specific provisions on the matter. *See* UTAH CODE § 78B-15-203 ("[A] parent-child relationship established under this chapter applies for all purposes, except as otherwise specifically provided by other law of this state."). As the court of appeals noted, where another statute provides its "own definition of [the] parent-child relationship for specific purposes," the Parentage Act "is subordinate" to that statute. *In re Est. of Heater*, 2020 UT App 70,

¶ 11. As subsection 114(1) of the Probate Code provides its own definition of the parent-child relationship, it stands on its own. But it also permits an individual to establish parentage through the Parentage Act.

¶28 We recognize that, with respect to the father-child relationship, subsection 114(1) differs from the Parentage Act's presumption of paternity. In contrast to the Parentage Act, the Probate Code permits the father-child relationship to be established based on biological fatherhood alone, without reference to the marital status of the natural parents. *Compare* UTAH CODE § 75-2-114(1) ("[A]n individual is the child of the individual's natural parents, *regardless of their marital status*." (emphasis added)), *with id.* § 78B-15-204(1) (explaining that a "man is presumed to be the father of a child if" certain requirements are met, all hinging upon the marital status of the man and the child's mother), *and id.* §§ 78B-6-110(3)(a), -120(1)(f), -121, -122(2) (providing that an unmarried biological father has no right to be notified of an adoption or to consent, or refuse to consent, to an adoption unless he strictly complies with certain requirements).

¶29 But although the father-child relationship is defined differently in the Probate Code and the Parentage Act, we do not find the two statutes to be in conflict in the context of a probate case. Rather, they co-exist. For purposes of intestate succession, a person can establish the father-child relationship through section 114(1) of the Probate Code, which recognizes natural parent-child relationships that the Parentage Act generally would not recognize unless specific procedural requirements had been met. Alternatively, a person could choose to establish the father-child relationship by reference to the provisions of the Parentage Act.

¶30 The latter method is an optional way to prove paternity in a probate case. Accordingly, we reject Kirkland's argument that the statute makes it the sole, mandatory method of doing so.

¶31 Kirkland argues in the alternative that even if we accept the definition of the parent-child relationship contained in subsection 114(1), Carlon does not meet it because he has not established that Heater is his "natural" father. Kirkland contends that the term "natural parent" in subsection 114(1) does not mean biological or genetic parent, but rather non-adoptive parent. And she asserts that Carlon's non-adoptive father is his presumed father, Thomas. She argues that the court of appeals erred when it

found otherwise. *In re Est. of Heater*, 2020 UT App 70, ¶¶ 13 n.7, 20.

¶32 But Kirkland is wrong that "natural parent" does not mean biological parent. While "natural parent" may in some contexts be used in contrast to "adoptive parent," that is *because* the ordinary meaning of "natural parent" is biological or genetic parent. The dictionary definition of "natural" includes "begotten as distinguished from adopted," and "being a relation by actual consanguinity as distinguished from adoption."[5] *Natural*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/natural (last visited Sept. 23, 2021). We also note that in Black's Law Dictionary under "natural father," one is directed to the definition of "biological father." *See Natural father*, BLACK'S LAW DICTIONARY (11th ed. 2019). Black's then defines biological father as "[t]he man whose sperm impregnated the child's biological mother.—Also termed *natural father*; *birth father*; *genetic father*." *Biological father*, BLACK'S LAW DICTIONARY (11th ed. 2019).

¶33 In the law, "natural parent" is also used synonymously with biological or genetic parent. For instance, in *Santosky v. Kramer*, 455 U.S. 745 (1982), the Supreme Court discussed what

---

[5] *See also Beget*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/beget (last visited Sept. 23, 2021) ("[T]o procreate as the father[.]"); *Consanguineous*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/consanguineous (last visited Sept. 23, 2021) ("[O]f the same blood or origin . . . descended from the same ancestor[.]").

Kirkland cites the Merriam Webster Dictionary of Law, stating that it "establishes that the word 'natural' means not 'adopted.'" But when read in context, that dictionary also defines "natural" as "begotten, as distinguished from adopted" and "relat[ed] by consanguinity as opposed to adopted." *Natural*, MERRIAM-WEBSTER LAW DICTIONARY, https://www.merriam-webster.com/dictionary /natural#legalDictionary (last visited Sept. 23, 2021). Accordingly, while we agree with Kirkland that "natural parent" may be used in contrast to "adoptive parent," it does not follow that "natural parent" does not mean biological parent. Rather, in that context "natural parent" is being used as a synonym for biological parent.

due process is required when terminating parental rights. The Court referred to the petitioners, who were the biological parents of the children at issue in the case, as "the natural parents." *Id.* at 751; *see also id.* at 753 ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when *blood relationships* are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." (emphasis added)).

¶34 We too have used the term "natural parent" interchangeably with "biological parent." *See, e.g.*, *Hill v. Nakai* (*In re Est. of Hannifin*), 2013 UT 46, ¶ 22, 311 P.3d 1016 (explaining that the Probate Code "prohibit[s] adopted children from taking by intestacy from both their natural parents and their adoptive parents" and then contrasting that with the doctrine of equitable adoption, which "in no way alters the legal relationship between . . . the claimant and the biological parents"); *Manzanares v. Byington* (*In re Adoption of Baby B.*), 2012 UT 35, ¶ 58 n.21, 308 P.3d 382 (collecting cases, many of which equate a child's "natural" father with the biological father); *J.S. v. P.K.* (*In re Adoption of I.K.*), 2009 UT 70, ¶¶ 8, 10, 16, 19, 21, 23, 220 P.3d 464 (using the term "Natural Father" interchangeably with "biological father"); *Bonwich v. Bonwich*, 699 P.2d 760, 761–62 (Utah 1985) (equating a "natural parent" with a "biological parent"); *id.* at 762 ("[D]espite the blood relationship, a strong mutual bond does not always develop between natural parent and child."); *Hutchison v. Hutchison*, 649 P.2d 38, 39–40 (Utah 1982) (explaining that, although a blood test excluded the respondent as the child's "natural father, she considers him her father both psychologically and biologically"); *Walton v. Coffman*, 169 P.2d 97, 103 (Utah 1946) ("The common experience of mankind teaches 'that blood is thicker than water,' that usually there is a much stronger attachment between a natural parent and child than is developed between the child and a foster parent . . . .").

¶35 The ordinary meaning of "natural parent" in the law may be viewed as "an empirical question—about the sense of a word or phrase that is most likely implicated in a given linguistic context." *Richards v. Cox*, 2019 UT 57, ¶ 18, 450 P.3d 1074 (citation omitted) (making this point in presenting a corpus linguistic analysis of the meaning of "employment" in article X, section 8 of the Utah Constitution). To answer such a question, it may not be

enough to cite a number of relevant dictionary examples. *See id.* (explaining that "dictionary definitions" may not be "dispositive" in all cases). It may be helpful to assess the meaning of "natural parent" across *all* of our cases—a form of "corpus" of the language of our law. *See* Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 YALE L.J. 788, 868 (2018) (emphasizing that corpus linguistic analysis "facilitates transparency and scrutiny" and provides "an empirical check on our . . . linguistic intuition" (citation omitted)).

¶36 In a comprehensive review of all the Utah appellate opinions using the term "natural parent" up to the effective date of the statutory language in question,[6] a Westlaw search uncovered 131 relevant cases. Of those cases, many used "natural parent" in a manner or context in which its meaning was unclear. But in every case in which the context was sufficient to determine the meaning of this term (twenty-four), the term "natural parent" was used to refer to "biological parent."[7] We found no case in

---

[6] The effective date is July 1, 1998. S.B. 75, Uniform Probate Code Amendments, § 22, Utah Laws 166, 175 (codified at UTAH CODE § 75-2-114). We used this date range in the event that the meaning of the search term underwent a change after the statute's effective date and to limit the search results to a reasonable number for review. The date range of the 131 results spanned from August 16, 1913, *see Hummel v. Parrish*, 134 P. 898 (Utah 1913), to August 21, 1997, *see Brinkerhoff v. Brinkerhoff*, 945 P.2d 113 (Utah Ct. App. 1997). Notably, in the cases we analyzed that came after the statute's enactment, *see supra* ¶ 34, the meaning of "natural parent" had not changed.

[7] *State ex rel. J.W.F.*, 799 P.2d 710, 712–14, 716 (Utah 1990) (determining that a man who was not a child's biological father was not the child's natural father), *superseded by statute as recognized in Mackley v. Openshaw*, 2019 UT 74, 456 P.3d 742; *Wiese v. Wiese*, 699 P.2d 700, 701–03 (Utah 1985) (equating biological parents with natural parents); *Hutchison v. Hutchison*, 649 P.2d 38, 40–41 (Utah 1982) (referring to a biological parent as a child's natural parent); *State ex rel. Baby Girl M.*, 476 P.2d 1013, 1017 (Utah 1970) (equating a child's biological mother with her natural mother); *D_ P_ v. Soc. Serv. & Child Welfare Dep't of Relief Soc'y Gen. Bd. Ass'n of Church of Jesus Christ of Latter-Day Saints*, 431 P.2d

(continued . . .)

which "natural parent" was clearly used to mean "non-adoptive parent" to the exclusion of biological parent. This is an aid to our

547, 547, 550 (Utah 1967) (referring to a biological mother as a natural mother); *Chidester v. Ellett* (*In re Adoption of Trimble*), 398 P.2d 25, 26 (Utah 1965) (referring to a biological father as the natural father); *State ex rel. London v. Bell*, 390 P.2d 856, 857 (Utah 1964) (using the term natural mother to refer to the biological mother); *State ex rel. F_ v. Dade*, 376 P.2d 948, 949 (Utah 1962) (referring to biological parents as natural parents); *State ex rel L.J.J. v. Mr. & Mrs. B_*, 360 P.2d 486, 488 (Utah 1961) (equating biological parents with natural parents); *Midgley v. Denhalter* (*In re Lewis' Est.*), 242 P.2d 565, 568 (Utah 1952) (referring to a person's biological parents as his natural parents); *Walton v. Coffman*, 169 P.2d 97, 101 (Utah 1946) (using natural parents to refer to children's biological parents); *Benner v. Garrick* (*In re Benner's Est.*), 166 P.2d 257, 258 (Utah 1946) (referring to biological parents as natural parents), *superseded by statute as recognized in Hill v. Nakai* (*In re Est. of Hannifin*), 2013 UT 46, 311 P.3d 1016; *Kurtz v. Christensen*, 209 P. 340, 342–44 (Utah 1922) (referring to biological parents as natural parents); *Harrison v. Harker*, 142 P. 716, 720–21, 728, 730, 737, 744, 749 (Utah 1914) (referring to biological parents as natural parents); *Hummel*, 134 P. at 901–02 (equating a child's birth mother to her natural parent); *Brinkerhoff*, 945 P.2d at 115 (equating children's biological father with natural parent); *R.S. v. State* (*State ex rel. J.M.*), 940 P.2d 527, 536 (Utah Ct. App. 1997) (using natural parent to refer to a child's biological father); *Duncan v. Howard*, 918 P.2d 888, 891 (Utah Ct. App. 1996) (equating a child's biological parents with its natural parents); *Giffen v. R.W.L.* (*In re Adoption of R.N.L.*), 913 P.2d 761, 762 (Utah Ct. App. 1996) (referring to a child's biological parents as the natural mother and natural father); *In re Adoption of W.*, 904 P.2d 1113, 1117 (Utah Ct. App. 1995) (referring to biological fathers as natural fathers); *State ex rel. W.D. v. Drake*, 770 P.2d 1011, 1012 (Utah Ct. App. 1989) (equating biological parents with natural parents); *Hamby v. Jacobson*, 769 P.2d 273, 274 (Utah Ct. App. 1989) (referring to children's biological parents as their natural parents); *T.R.F. v. Felan* (*In re Adoption of T.R.F.*), 760 P.2d 906, 914 (Utah Ct. App. 1988) (referring to a child's natural father as its biological father); *In re K.B.E.*, 740 P.2d 292, 293 (Utah Ct. App. 1987) (referring to a child's biological mother as her natural mother).

inquiry into contextual meaning beyond the assistance provided by dictionaries, our linguistic intuition, or selected sample sentences. *See Richards*, 2019 UT 57, ¶ 19. It confirms that in the law, "natural parent" means biological parent.

¶37 And the case Kirkland cites to establish that "natural parent" means only non-adoptive parent does not help her. *See In re Est. of Olenick*, 562 N.E.2d 293 (Ill. App. Ct. 1990). That case says "'[n]atural parents' means biological, or blood, as contrasted with adoptive." *Id.* at 300. *Olenick* in turn relies on another case, *McKeone v. Pesikey* (*In re Estate of Cregar*), 333 N.E.2d 540 (Ill. App. Ct. 1975), which does discuss "natural" versus "adoptive parents"—but throughout the opinion, the court uses "natural" as a synonym for "blood relation." *See, e.g.*, *id.* at 542–43 (explaining that the appellants were adopted by their "natural aunts," with whom they had a "blood relationship"). So even the case Kirkland relies on establishes that "natural parent" means biological parent.

¶38 The court of appeals correctly determined that, under the plain language of subsection 114(1), Carlon has established that Heater was his "natural parent." Carlon did this through genetic testing showing that he and Garret are half-siblings, thereby proving that Heater was his biological father.

¶39 In sum, we conclude that a person can establish the parent-child relationship under the Probate Code either by satisfying the plain terms of subsection 114(1)—i.e., showing that the deceased individual was their "natural parent"—or by utilizing one of the methods or definitions found in the Parentage Act. And here, Carlon has established that Heater was his "natural parent" by proving that Heater was his biological father through genetic testing.

*B. The Utah Uniform Parentage Act*

¶40 Even assuming that the Parentage Act did control the establishment of the parent-child relationship in a probate case, Carlon has also satisfied the provisions of that statute. As discussed above, subsection 114(1) of the Probate Code provides that "the parent and child relationship may be established as provided in [the Parentage Act]." UTAH CODE § 75-2-114(1). And the Parentage Act states that "[a] man is presumed to be the father of a child if . . . he and the mother of the child are married to each other and the child is born during the marriage." *Id.* § 78B-15-204(1)(a). That presumption "may only be rebutted in accordance

with Section 78B-15-607." *Id.* § 78B-15-204(2). Section 607 of the Parentage Act, in turn, explains that to rebut the statutory presumption of fatherhood, a party may, among other things, provide "genetic test results that exclude the presumed father" or "genetic test results that rebuttably identify another man as the father." *Id.* § 78B-15-607(3)(a)–(b).

¶41 Carlon has done both. Carlon's mother Myrol was married to Thomas when she gave birth to Carlon. So we agree with Kirkland that under subsection 204(1)(a) of the Parentage Act, Thomas was Carlon's presumed father. But Carlon has successfully rebutted that presumption in the manner established by the Parentage Act. He produced genetic test results showing the man he believed to be his full biological brother did not share the same biological father. This was genetic evidence "exclud[ing] [his] presumed father"—Thomas—as his genetic father. *See id.* § 78B-15-607(3)(a). And he submitted genetic test results that established he and Garret were biological half-siblings. These genetic test results constituted evidence "identify[ing] another man"—Heater—as Carlon's father. *See id.* § 78B-15-607(3)(b). Thus, within the probate case, Carlon rebutted the Parentage Act's presumption that Thomas was his father and identified Heater as his genetic father in the manner prescribed by the Parentage Act.

¶42 Kirkland makes one argument as to why these test results are insufficient to rebut the presumption that Thomas was Carlon's father. She points to section 603 of the Parentage Act, which states that when commencing an action, "a man whose paternity of the child is to be adjudicated" "shall be joined as [a] part[y] in [the] proceeding." *Id.* § 78B-15-603(2). She notes that because Thomas is deceased, he cannot be joined as a party. And she reasons that this makes it too late for Carlon to rebut Thomas's paternity.

¶43 But this is a significant logical leap for which Kirkland provides no legal or analytical support. Kirkland's argument is based on an assumed premise that an inability to comply with the joinder provision of the Parentage Act constitutes an absolute bar to adjudicating parentage. This would mean that a child could never adjudicate the paternity of a man after the man's death. But she offers no legal authority or textual argument for this proposition. There is no provision in the Parentage Act that says a petition cannot be brought if the "man whose paternity of the child is to be adjudicated" is deceased. Further, Kirkland's

argument runs contrary to other provisions of the Act. Both the Parentage Act's standing and venue provisions suggest that it can apply to deceased individuals and their estates. *See id.* § 78B-15-602(6) (explaining that "a representative authorized by law to act for an individual who would otherwise be entitled to maintain a proceeding but who is deceased" has standing to bring an action under the Parentage Act); *id.* § 78B-15-605(3) ("Venue for a judicial proceeding to adjudicate parentage is in the county of this state in which . . . a proceeding for probate or administration of the presumed or alleged father's estate has been commenced.").[8]

¶44 We conclude that Carlon has rebutted the presumption that Thomas is his father and identified Heater as his biological father in a manner prescribed by section 607 of the Parentage Act. And we find Kirkland's joinder argument to be unpersuasive. Accordingly, even if Kirkland had prevailed on her argument that in a probate proceeding the parent-child relationship can be rebutted or established only in accordance with the Parentage Act,

---

[8] We note that Kirkland's argument also seems to assume that to establish a parent-child relationship within the probate case using the Parentage Act, a probate litigant would need to bring a separate proceeding under the Parentage Act that complies with all of the Parentage Act's procedural requirements—although Kirkland has not explicitly made this connection. However, it is not clear from the Probate Code whether the reference to the Parentage Act in subsection 114(1) requires this, or whether a person can simply use the methods articulated in the Parentage Act to establish a parent-child relationship within the probate case. Nor is it clear whether, if done within a probate case, the party must comply with the Parentage Act's procedural requirements, such as joinder and notice. *See* UTAH CODE § 75-2-114(1) (stating only that "[t]he parent and child relationship may be established as provided in Title 78B, Chapter 15, Utah Uniform Parentage Act"). We do not resolve this question because Kirkland has not raised it. And we do not opine on whether other arguments could be made as to why Carlon has not satisfied the Parentage Act. We simply reject Kirkland's argument that the joinder provision of the Parentage Act prohibits Carlon from rebutting Thomas's presumed paternity.

it would not present a barrier for Carlon because he has satisfied the terms of both the Parentage Act and the Probate Code.

### C. Subsection 114(2) of the Probate Code: The "One-Set-of-Parents Rule"

¶45 Kirkland next argues that even though the genetic test results show Heater was Carlon's biological father, Carlon cannot be an heir to Heater's estate because the Probate Code does not allow him to inherit from two fathers—in other words, she claims that the Probate Code establishes a "one-set-of-parents rule." Kirkland does not assert that Carlon actually did inherit from Thomas. But she argues that because Thomas was Carlon's presumptive father when Thomas died, Carlon was Thomas's legal heir and could have inherited from his estate if there had been one.

¶46 We agree with the court of appeals that the Probate Code does not create a "one-set-of-parents rule" that is a "universal principle governing intestate succession." *In re Est. of Heater*, 2020 UT App 70, ¶ 19. The "one-set-of-parents rule" to which Kirkland refers is found in a separate subsection of the Probate Code, subsection 114(2). *See In re Est. of Hannifin*, 2013 UT 46, ¶ 26 n.9 (holding that subsection 114(2) "establishes a one-set-of-parents inheritance rule" in the context of adoptions). And subsection 114(2) creates such a rule only where a child has been adopted, providing that "[a]n adopted individual is the child of the adopting parent or parents and not of the natural parents." UTAH CODE § 75-2-114(2). So, an adopted child can inherit through intestate succession only from the child's adopting parents, not from both the adopting and biological parents.

¶47 Kirkland acknowledges that subsection 114(2) is inapplicable here because Carlon does not have an adoptive parent. But she argues that the same principles that support the one-set-of-parents rule in the context of subsection 114(2) are equally applicable here, where subsection 114(1) is at issue. But that is a policy choice for the legislature to make. We must follow the language of the statute. And the plain language of subsection 114(2) makes clear that it applies only when a child has been adopted. Further, Kirkland cites no language in the Probate Code suggesting that the one-set-of-parents rule within subsection 114(2) has any application to subsection 114(1). Accordingly, we agree with the court of appeals that "absent statutory language extending the rule beyond certain adoption scenarios, we cannot

conclude that the rule applies to this case, which does not feature an adoption of any sort." *In re Est. of Heater*, 2020 UT App 70, ¶ 19.

¶48 Kirkland also argues that another case in which we interpreted the Probate Code, *Hill v. Nakai (In re Estate of Hannifin)*, 2013 UT 46, 311 P.3d 1016, supports her position. Kirkland asserts that in that case, we held that the Probate Code establishes a one-set-of-parents rule. But in *In re Estate of Hannifin*, we concluded only that subsection 114(2) created such a rule in the context of adoptions. 2013 UT 46, ¶ 26 n.9. Specifically, we held that subsection 114(2) conflicted with the common law doctrine of equitable adoption.[9] *Id.* ¶¶ 2, 19–27. We explained that, in intestate cases, this common law doctrine permitted "dual succession" from both an individual's natural parents and their adoptive parents. *Id.* ¶¶ 23–24. But our cases espousing the doctrine of equitable adoption were before the legislature enacted subsection 114(2). Therefore, we held that subsection 114(2) "expressly foreclosed" the common law equitable adoption rule because that rule permitted dual succession. *Id.* ¶ 24; *see also* UTAH CODE § 75-1-103 ("Unless displaced by the particular provisions of this code, the principles of law and equity supplement its provisions."). But our interpretation of subsection 114(2) in *In re*

---

[9] We recognized the common law doctrine of equitable adoption in *In re Williams' Estates*, stating:

> It is generally recognized that where a child's parents agree with the adoptive parents to relinquish all their rights to the child in consideration of the adopted parents' agreement to adopt such child, . . . and such agreement is fully performed by all parties connected with such contract except there is no actual adoption, the courts will decree specific performance of such contract and thereby award to the child the same distributive share of the adoptive parents' estate as it would have been entitled to had the child actually been adopted as agreed.

348 P.2d 683, 684 (Utah 1960), *superseded by statute as recognized in In re Est. of Hannifin*, 2013 UT 46, ¶ 2.

*Estate of Hannifin* does not provide a basis for extending that provision outside of that subsection or to the circumstances here.

¶49 Accordingly, we reject Kirkland's assertion that the one-set-of-parents rule from subsection 114(2) should be extended here or that it impacts Carlon's ability to establish Heater's biological paternity in any way.

## CONCLUSION

¶50 Carlon has established a parent-child relationship with Heater both by showing that Heater was his "natural parent" under subsection 114(1) and by satisfying the provisions of the Parentage Act, as permitted by subsection 114(1). The court of appeals correctly affirmed the district court's ruling that Heater is Carlon's natural father and its order naming Carlon as one of Heater's heirs.[10] We affirm.

---

[10] In affirming, the court of appeals opined that this outcome was "bizarre, or at least at odds with societal expectations." *Kirkland v. Carlon* (*In re Est. of Heater*), 2020 UT App 70, ¶ 20, 466 P.3d 728. The court then suggested that Kirkland would "clearly prevail" if Utah had adopted the 2010 amendments to the Uniform Probate Code (UPC) "because the UPC, unlike the Probate Code, provides that where a child has a presumed father under the [Parentage Act] who is not the child's biological father, the presumptive father is the child's only father for purposes of intestate succession." *Id.* But the UPC sections in question were updated again in 2019. This update was generated to respond to changes in the Uniform Parentage Act of 2017. *See* UNIF. PROB. CODE § 2-117, hist. n. (UNIF. L. COMM'N 2019). And our legislature has not adopted the 2010 or the 2019 amendments to the UPC, nor the 2017 amendments to the Uniform Parentage Act upon which the updated UPC now relies. As such, we do not opine on what the result would be if the legislature chooses to adopt one or more of these uniform laws in the future, though we note that the term "genetic parent" from section 2-115 of the 2010 version of the UPC upon which the court of appeals relied has been removed, leaving the outcome far less certain. *Id.* § 2-117, cmt. (UNIF. L. COMM'N 2019).